# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

———————

No. 05-3122

———————

United States of America,

        Appellee,

v.

Mary K. Edelmann,

        Appellant.

\*     Appeal from the United States
\*     District Court for the
\*     Eastern District of Arkansas.

———————

Submitted: March 14, 2006
Filed: August 17, 2006

———————

Before ARNOLD, JOHN R. GIBSON, and SMITH, Circuit Judges.

———————

SMITH, Circuit Judge.

A jury convicted Mary K. Edelmann of two counts of mail fraud, in violation of 18 U.S.C. § 1341; two counts of wire fraud, in violation of 18 U.S.C. § 1343; and one count of money laundering, in violation of 18 U.S.C. § 1957. The district court[1] sentenced Edelmann to 92 months' imprisonment and three years of supervised release and ordered Edelmann to pay a $500 special assessment and restitution in the amount of $210,730.83. Edelmann appeals, arguing that (1) the district court erred in refusing to suppress her incriminating statements; (2) the district court erred by removing her

———————

[1]The Honorable George Howard, Jr., United States District Judge for the Eastern District of Arkansas.

counsel of choice; (3) the district court erred by denying her request to proceed pro se; (4) the district court erred in allowing the government to introduce character evidence; (5) the evidence is insufficient to sustain her convictions on each of the five counts; (6) the district court erred in admitting Bureau of Prison records to prove a prior conviction; (7) the district court was without authority to amend the judgment to include a missing forfeiture award; and (8) the district court committed errors in calculating her offense level and criminal history, resulting in an unreasonable sentence. We affirm.

## I. *Background*

Edelman's first mail fraud count stemmed from misrepresentations made to a potential business lender. In January 2001, Edelmann, owner and operator of a paralegal service company in Maumelle, Arkansas, contacted Theodore Powell seeking venture capital for her company. Powell referred her to Eleanor Vaughn in Arizona. After receiving Edelmann's project proposal and company prospectus, Vaughn relayed the documents to Victor Beard. Beard communicated to Edelmann, through Vaughn, that he required additional documentation before he would loan $50,000 to Edelmann. Shortly thereafter, Edelmann sent the documents Beard requested to Vaughn, who subsequently hand-delivered the documents to Beard. Beard's review of the documents made him suspect Edelmann's company did not actually have access to the more than $2,000,000, as represented by the documents. As a result, Beard requested a letter from Edelmann's bank showing that the $2,000,000 was secured and accessible to Edelmann. Edelmann responded by faxing Beard a letter purportedly from Bank of America. Beard recognized the letter as fraudulent. A subsequent investigation of the financial statements and tax returns forwarded to Beard by Edelmann revealed that they were not genuine.

Edelmann's second mail fraud count was based upon her actions in connection with an application for a home loan. In March 2001, Edelmann applied for a loan through Lexxel Funding, an Internet loan broker, submitting purported bank

statements and wage and earnings forms. Lexxel then sought funding from BNC Mortgage ("BNC") to fund the loan. BNC agreed to loan Edelmann $125,000 to purchase a $225,000 home in Maumelle, Arkansas. Edelmann was required to bring $102,825.08 to closing as a down payment on the property.

Edelmann's first wire fraud count was based on actions she took before closing on her house. Before closing, Edelmann responded to Thomas Richardson's newspaper ad in which Richardson stated that he was interested in purchasing property for cash. Edelmann told Richardson that she expected to obtain a substantial amount of money from an overseas investment soon and needed a short-term loan for "operating cash" for her company's expenses. She promised Richardson a 100 percent return on his money within 30 days. She falsely represented to Richardson that she was an attorney and that she would ensure that all documents were legally sufficient. She provided Richardson with false financial documents similar to those she previously provided to Beard, including a false Bank of America letter showing that she had $10,000,000 in a guaranteed, but frozen, account. Based on these documents, Richardson agreed to lend Edelmann $250,000 and drew up a promissory note and guarantee for their signatures. Richardson then arranged for $147,174.92 to be wired from his Charles Schwab ("Schwab") investment account into Edelmann's account at Superior Federal Bank; in addition, he arranged for $102,825.08 to be presented to Edelmann in the form of a Schwab check. Edelmann negotiated the check and had a cashier's check in that amount made payable to Standard Abstract and Title Company. She then took the check to Standard Abstract and Title Company and used it to close on the loan from BNC. She used the money wired to her account to buy furniture and equipment for her business.

Edelmann's second wire fraud count stems from her conduct in April 2001. At that time, Edelmann offered Richardson a job overseeing foreign investment projects. Richardson and Edelmann entered an employment contract in which Edelmann agreed to pay him a salary of $240,000 annually. Subsequently, Edelmann asked Richardson

-3-

to loan her an additional $50,000, explaining that because the anticipated return on her overseas investment was delayed, she needed additional operating capital. She agreed to pay Richardson 100 percent on this additional amount, or a return of $100,000. Relying on information provided for the first loan, as well as documentation of the anticipated return on the overseas investment, Richardson had $50,000 from his Schwab investment account wired to Edelmann's Internet bank account.

When the 30-day time frame for repayment had passed, Richardson requested that Edelmann pay on the promissory note. Edelmann, however, failed to do so and terminated Richardson's employment. Richardson sought to enforce the guarantee agreement by pursuing the $10,000,000 in "guaranteed funds" Edelmann claimed to have at Bank of America. When he presented his documentation to Bank of America, he was advised that Edelmann had no such account and that she had defrauded him. Bank of America representatives then contacted the Federal Bureau of Investigation (FBI) about the fraud, and the FBI began investigating Edelmann.

On August 14, 2001, the government filed a lis pendens and civil complaint in forfeiture against Edelmann's property. Immediately thereafter, Edelmann's attorney, John Kitterman, contacted Assistant United States Attorney ("AUSA") Dan Stripling to request a meeting. An initial meeting was held in Kitterman's office and was attended by Edelmann, Kitterman, FBI Special Agent Sharon Dawkins, and Stripling. At the meeting, Stripling advised Edelmann that the government suspected she had committed crimes and that any statement she made could be used against her. During the meeting, Edelmann and Kitterman voluntarily discussed people, events, and correspondence pertaining to a prime-lending scheme or trading program in which Edelmann was involved. The government clearly stated to Edelmann that its investigation was in the preliminary stages. At the conclusion of the meeting, the parties agreed that Dawkins, Edelmann, and Kitterman would meet the next day so that Edelmann could give Dawkins copies of numerous documents.

After the first meeting, Edelmann met four more times with Dawkins and Kitterman, once at Edelmann's business office in Maumelle, Arkansas, and three times at the United States Attorney's Office. Edelmann gave Dawkins documents and discussed the involvement of various people in the suspected lending scheme. Stripling and Dawkins confronted Edelmann with discrepancies in her story. At the fourth meeting, Edelmann admitted greater involvement in the scheme and admitted creating a counterfeit bank letter signed by "Sandra Walsh."

At a final meeting in Stripling's office among Edelmann, Kitterman, Stripling, and Dawkins, Edelmann was given an opportunity to explain her involvement in the scheme. While at previous meetings Edelmann admitted receiving $500,000 from James Harrold in a similar scheme, she consistently denied receiving any more money. However, after Edelmann was confronted with evidence that banking records showed that she received an additional $500,000 from Harrold, she admitted receipt of the additional money. No further meetings occurred, and the government never made a formal plea offer to Edelmann or other agreement with Edelmann.

Edelmann was subsequently indicted for mail fraud, wire fraud, money laundering, and making false statements to a government agent. She pleaded not guilty. Attorney Alvin D. Clay represented Edelmann at the plea hearing. In later proceedings, attorney Darrell Brown represented Edelmann before the district court. After Clay informed the government that both he and Brown would represent Edelmann during trial, the government notified the district court that the FBI was investigating Clay for fraud and that a criminal case against Clay was opened at the United States Attorney's Office for the Eastern District of Arkansas. The district court removed Clay as Edelman's counsel after she refused to waive a potential conflict of interest caused by the criminal case against Clay.[2]

_____

[2]Clay was aware of the investigation because a search warrant was executed at his office in January 2004. The government requested a pretrial hearing pursuant to Rule 55 of the Federal Rules of Criminal Procedure to inform Edelmann of her

Approximately four days before trial, Edelmann filed a motion to proceed pro se. The district court denied Edelmann's motion to proceed pro se, finding that (1) the case had been continued numerous times at Edelmann's request; (2) Edelmann requested to proceed pro se five days before trial; (3) Brown had worked on the case for many months, as Edelmann's counsel of choice, and was thoroughly familiar with the issues in the case; and (4) many issues were involved in the case. The trial commenced on June 21, 2004, with Brown representing Edelmann.

At trial, the district court admitted into evidence under Federal Rule of Evidence 404(b) three of Edelmann's prior convictions and an additional prior bad act

---

counsel's conflict of interest and to permit her to waive the conflict at the hearing. The district court determined that a conflict of interest existed, meaning that Edelmann would have to waive the conflict before Clay was allowed to proceed as her counsel. Edelmann advised the district court that while Clay had informed her of the investigation a week prior to the hearing, she needed more information about the investigation to determine whether to waive the conflict. The district court then took a recess to give Edelmann one hour to determine whether she would waive the conflict, stating:

> It doesn't matter with me what your decision is. The only obligation I have is to make sure that you have been advised, because if there's a conviction I don't want you coming back here with another lawyer stating that you were deprived of due process, that you were not afforded a fair trial. That has been done quite often in that courtroom, and what we're trying to do is avoid a second trial.

After the recess, Edelmann informed the court that "after thinking it over and doing some research on it I just don't have enough information [to decide whether to waive the conflict]." Based on Edelmann's refusal to affirmatively waive the conflict, the district court removed Clay as Edelmann's counsel and ordered Brown to prepare for trial, which was to commence on June 21, 2004.

-6-

based upon a fraud scheme Edelmann committed after the indictment. The first two convictions occurred on March 29, 1989, in the United States District Court for the Western District of Oklahoma. The first conviction was for causing the filing of a false Currency Transaction Report by giving a false name, address, and Social Security number to conceal her identity to the Internal Revenue Service. The second conviction was for theft from a financial institution by presenting a forged check for cash.

The third federal conviction was for attempted escape from federal custody on July 26, 1989. In 1988, Edelmann was placed in the custody of the Federal Bureau of Prisons pursuant to a judgment and order of the Western District of Oklahoma. While incarcerated in a Kentucky federal penitentiary, Edelmann fabricated three court orders and used an envelope she stole from the United States Probation Office in the Western District of Oklahoma to send them to a case manager at the Kentucky facility. Two of the fabricated orders pertained to her federal convictions. One of the orders said that one of her Oklahoma sentences should be vacated immediately, while the other order stated that her sentence of 48 months should be reduced to 14 months in a separate case. Both orders contained the forged signature of United States District Judge Lee R. West. The third fabricated order was purportedly from Bossier Parish, Baton Rouge, Louisiana, and stated that a detainer lodged against Edelmann was dismissed. This order contained the forged signature of Judge Gary L. Howard.

The uncharged prior bad act that the district court admitted into evidence occurred after charges were filed in the instant case. On August 12, 2002, a loan for $5,000 was made by an Internet loan company, Equity 1, in the name of Chris A. Edelmann, Edelmann's husband. The loan was secured by a 2002 Chevrolet Avalanche registered to Chris Edelmann. During the loan process, Equity 1 requested a picture of the applicant's driver's license. The applicant forwarded an Arkansas State Driver's license in the name of Chris Edelmann but bearing the picture of a female. The borrower defaulted on the loan in September 2003, and Equity 1 repossessed the

2002 Chevrolet Avalanche. The Equity 1 loan agent confirmed that he had only spoken to a female in this transaction who identified herself as Chris Edelmann. Equity 1 subsequently received an order bearing Pulaski County Judge Willard Proctor's signature, ordering Equity 1's release of the truck to the plaintiff. The government argued that Edelmann forged Judge Proctor's signature.[3]

The jury convicted Edelmann on all charges. At sentencing, the district court made factual findings on enhancements recommended in the presentence investigation report ("PSR"), including the inclusion of one criminal history point for Edelmann's conviction in a separate case filed against her in the Eastern District of Arkansas. The district court sentenced Edelmann to 92 months' imprisonment and three years of supervised release and ordered Edelmann to pay a $500 special assessment and restitution in the amount of $210,730.83.

---

[3]On September 23, 2003, a complaint and an ex parte motion for emergency temporary injunction was filed on behalf of Chris Edelmann against Equity 1 in the Pulaski County Circuit Court in Little Rock, Arkansas. The Honorable Willard Proctor took up the complaint and motion for temporary injunction that same day. Judge Proctor issued an order on the motion for temporary injunction, prohibiting the removal of the 2002 Chevrolet Avalanche from recovery lot A in North Little Rock, Arkansas, by any party, including the plaintiff.

On September 24, 2003, a different order, dated September 22, 2003, and purportedly signed by Judge Proctor, was faxed to Equity 1, stating that Equity 1 was to release the 2002 Chevrolet Avalanche immediately to the plaintiff, that Equity 1 was prohibited from coming within 500 yards of any property where the vehicle was parked, and that Equity 1 was prohibited from any further actions to take possession of the vehicle. When Judge Proctor learned of the order dated September 22, 2003, he stated that he did not sign the order and did not authorize anyone else to sign it on his behalf.

## II. *Discussion*

Edelmann appeals, raising the following eight arguments: (1) the district court erred in refusing to suppress her incriminating statements; (2) the district court erred by removing her counsel of choice; (3) the district court erred by denying her request to proceed pro se; (4) the district court erred in allowing the government to introduce character evidence; (5) the evidence is insufficient to sustain her convictions on each of the five counts; (6) the district court erred in admitting Bureau of Prison records to prove a prior conviction; (7) the district court was without authority to amend the judgment to include a missing forfeiture award; and (8) the district court committed several errors in calculating her offense level and criminal history, resulting in an unreasonable sentence.

## A. *Incriminating Statements*

Edelmann argues that the district court should have suppressed incriminating statements she made to government agents during the preindictment meetings. Specifically, Edelmann asserts that her attorney provided ineffective assistance by advising her to cooperate with the government's investigation without first obtaining a use immunity agreement that would have prohibited the government from introducing her statements against her should negotiations break down. In the alternative, she contends that the statements were inadmissible under Federal Rule of Evidence 410, which prohibits the introduction of statements made in the course of plea discussions. Neither argument has merit.

"We review the district court's decision to exclude [or admit] evidence for an abuse of discretion and will reverse a conviction only when an improper evidentiary ruling has affected substantial rights or had more than a slight effect on the verdict." *United States v. Naiden*, 424 F.3d 718, 722 (8th Cir. 2005).

## 1. *Sixth Amendment Right to Counsel*

Before reaching the issue of whether Edelmann's counsel was ineffective, we must first address whether Edelmann even had a right to counsel during the preindictment meetings with the government. If no right to counsel existed, no valid claim for ineffective assistance can be made. *Davis v. United States*, 512 U.S. 452, 456–57 (1994).

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." The right to counsel "does not attach until a prosecution is commenced, that is, at or after the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *Texas v. Cobb*, 532 U.S. 162, 166 (2001) (internal quotations and citation omitted); *see also Moran v. Burbine*, 475 U.S. 412, 428 (1986) (holding that, because the Sixth Amendment right to counsel attaches only after the first formal charging proceeding, a defendant who makes inculpatory statements to the police during an interrogation session before such proceeding is initiated has no right to counsel).

The right to counsel "becomes applicable only when the government's role shifts from investigation to accusation. For it is only then that the assistance of one versed in the intricacies of the law is needed to assure that the prosecution's case encounters the crucible of meaningful adversarial testing." *Moran*, 475 U.S. at 430. Thus, if the right to counsel has not attached, the defendant has no right to the effective assistance of counsel. *Pollard v. Delo*, 28 F.3d 887, 888 (8th Cir. 1994).

Here, the government had not filed formal charges against Edelmann, indicted her, filed an information against her, arraigned her, or instigated a preliminary hearing at the time of the preindictment meetings with Edelmann. In fact, the government clearly stated to Edelmann during the meetings that its investigation was in the preliminary stages. Just as there is no right to counsel during an interrogation session

-10-

if the interrogation takes place before the initiation of adversary judicial proceedings, so too is there no right to counsel in the present case where Edelmann initiated contact with the government and voluntarily agreed, through the advice of her attorney, to meet with the government agents before she was indicted. Therefore, because no right to counsel attached at the time Edelmann met with the government agents, her right to effective assistance of counsel claim fails.

## 2. *Federal Rule of Evidence 410*

Edelmann's alternative argument is that her incriminating statements should be suppressed under Rule 410 of the Federal Rules of Evidence. We disagree.

Rule 410 provides that evidence of "any statement made in the course of plea discussions with an attorney for the government which do not result in a plea of guilty or which result in a plea of guilty later withdrawn" is not "admissible against the defendant who made the plea or was a participant in the plea discussions." The plain language of Rule 410 excludes "only those statements which are made in the course of plea discussions." *United States v. Hare*, 49 F.3d 447, 450 (8th Cir. 1995) (internal quotations and citation omitted). "Statements voluntarily offered either before any plea negotiation has begun or after a plea agreement has been reached cannot be considered statements made 'in the course of plea discussions' within the meaning of the exclusionary rules." *Id*. We look to the specific facts of each case and the totality of the circumstances to determine whether the defendant's statements were made "in the course of plea discussions." *Id*. at 451. We have previously held that no plea discussion occurred where:

> (1) no specific plea offer was made; (2) no deadline to plead was imposed; (3) no offer to drop specific charges was made; (4) no discussion of sentencing guidelines for the purpose of negotiating a plea occurred—only generalized discussion to give the suspect an accurate appraisal of his situation occurred; and (5) no defense attorney was retained to assist in the formal plea bargaining process.

-11-

*United States v. Morgan*, 91 F.3d 1193, 1196 (8th Cir. 1996).

Here, Kitterman, Edelman's attorney during the preindictment interviews, testified at the suppression hearing that "from almost the beginning Mr. Stripling and I talked about some type of deal that she would be interested in yes, sir." Kitterman, however, could not say assuredly at what point Stripling "indicated that there was certainly a deal available to Ms. Edelmann." Kitterman said that "there was a clear understanding that we were doing this to *cooperate with the government in return for a favorable deal*." (Emphasis added). During the third, fourth, and fifth meetings, Kitterman testified that the government never revoked this "deal." When asked whether he advised Edelmann what the government had offered, Kitterman stated:

> Oh, I don't think we ever got anything more specific than a *vague fraud statute*, something that Dan and I had talked about that was his signifying we're going to try to simplify this. We're going to try to do something that we would agree to so he would live up to his part of the bargain. (Emphasis added).

When asked why the "deal" was not reduced to writing, Kitterman replied, "There was no specific reason why it wasn't reduced to writing. I'm sure he has his reason. Our reason was because *we were trying to get her totally out of this mess, no indictment whatsoever*." (Emphasis added). When asked whether Edelmann's cooperation was "in fact based on the deal *or the prospect of a deal* ," Kitterman responded in the affirmative. When asked whether Stripling's statement that "there was absolutely no deal prior to February 7, 2002," was accurate, Kitterman replied, "Well, depends on how you take that. *If he's talking about a specific deal, he's absolutely correct*." (Emphasis added). When asked whether a non-specific deal was in place prior to February 7, 2002, Kitterman replied in the affirmative.

Subsequently, Kitterman was shown a letter in which he wrote that the "United States Attorney will not seek an indictment regarding a Jim Harrold series of transactions." In addition, the letter indicated that the United States Attorney would

not seek any money laundering charges against Edelmann. His letter indicated that the charges "will be based simply on her transaction with Tom Richardson," and that "there was a deal and that deal was based on truthful cooperation." When asked whether it was fair to say, by the context of the letter, that there was a deal in place before the final meeting, Kitterman responded, "No. I think—well, yes, but not this deal. This deal was in place after that meeting." When questioned about whether the letter indicated that there was some deal in place prior to the final meeting with Stripling, Kitterman responded:

> We were hoping for the 5K, hoping to not be indicted, hoping for a lot of things. As time had gone on and meetings had gone on, he had pretty well assured us there wasn't any way that was going to happen but still left the door open. But we never really knew what was going to happen with the Indiana people. He obviously had a whole lot better idea than I did, but this [letter] recites what our agreement was after the meeting.

Lastly, Kitterman testified that "[t]here was never a firm agreement. There was a firm understanding that's what we were expecting and that's what we were trying to get to."

According to the government's rendition of the facts, Stripling advised Edelmann at the meeting that she was the "prime suspect of criminal wrongdoing and that any statement made by her could be used against her." While the meetings sought a benefit for Edelmann "down the road," a formal plea agreement was never signed. There was no "firm offer" to plead to specific charges, nor any discussion of the Sentencing Guidelines. There was never a deadline placed on accepting or rejecting any offer. The meetings took place at the initiative of Edelmann's counsel.

Applying a totality of the circumstances analysis, including the factors enumerated in *Morgan*, we first note that Edelmann, through Kitterman, voluntarily contacted and met the AUSA. Second, while the parties dispute whether the Guidelines were ever discussed at the meetings, even if Stripling mentioned a § 5K1 motion, this would equate to, at most, a general discussion of the Guidelines. There

is no indication in Kitterman's testimony that he and Stripling engaged in an in-depth conversation about what Edelmann's Guidelines range would be; in fact, Kitterman testified that they never got more specific than "a vague fraud statute." Third, Kitterman testified that the purpose of Edelmann meeting with the government was to "get her totally out of the mess, no indictment whatsoever." Therefore, Edelmann did not seek to plea; she wanted to avoid an indictment altogether. Fourth, Kitterman admitted that "no specific deal" had been offered. Fifth, Edelmann concedes that no deadline to plead was ever imposed by the government. In fact, Edelmann retained Kitterman to contact the government on her own initiative, not at the invitation of the government to engage in formal plea negotiations. Finally, both Kitterman and the government agree that no specific deal was made nor was any deal reduced to writing, which undermines the idea that formal plea negotiations occurred.

In sum, because we find that Rule 410 is inapplicable to the present case, we hold that the district court did not err in refusing to suppress Edelmann's incriminating statements made during the preindictment meetings.

## B. *Removal of Counsel*

Edelmann's second argument is that the district court violated her Sixth Amendment right to counsel by removing attorney Clay as her chosen trial counsel based upon the potential conflict posed by his being the subject of a fraud investigation by the same United States Attorney's office that indicted Edelmann. In response, the government contends that the district court correctly decided to remove Clay as Edelmann's counsel only after Edelmann declined to waive an actual conflict of interest.

We review issues regarding the disqualification of attorneys de novo. *United States v. Gonzales-Lopez*, 399 F.3d 924, 929 (8th Cir. 2005), *aff'd*, 126 S. Ct. 2557 (2006).

"A non-indigent criminal defendant's Sixth Amendment rights encompass the right to be represented by the attorney selected by the defendant." *Id*. at 928. The general rule is that "defendants are free to employ counsel of their own choice and the courts are afforded little leeway in interfering with that choice." *Id*. (internal quotations and citations omitted).

However, "the right to retain counsel of one's choice is not absolute." *Id*. at 929 (internal quotations and citations omitted). "The right to choice of counsel must not obstruct orderly judicial procedure or deprive courts of their inherent power to control the administration of justice." *Id*. (internal quotations and citations omitted). Therefore, courts must balance the defendant's right to counsel of his own choosing against the court's interest in the administration of justice. *Id*.

Additionally, "[t]he right to counsel's undivided loyalty is a critical component of the right to assistance of counsel; when counsel is burdened by a conflict of interest, he deprives his client of his Sixth Amendment right as surely as if he failed to appear at trial." *Bonin v. California*, 494 U.S. 1039, 1044 (1990). Thus, the "Supreme Court has recognized that the right to counsel guaranteed by the Sixth Amendment includes the 'right to representation that is free from conflicts of interest.'" *Atley v. Ault*, 191 F.3d 865, 869 (8th Cir. 1999) (quoting *Wood v. Georgia*, 450 U.S. 261, 271 (1981)). When an attorney has a conflict of interest, that attorney violates his duty of loyalty to his client and "fails to provide effective assistance of counsel." *Id*.

"[I]f a defendant establishes that her attorney has a potential conflict of interest, in order to prove that the conflict resulted in a violation of her Sixth Amendment right to effective assistance of counsel, she must demonstrate prejudice. However, prejudice is presumed when a defendant establishes that her attorney had an actual conflict of interest that adversely affected the attorney's performance." *United States v. Levy*, 25 F.3d 146, 155 (2d Cir. 1994). An actual conflict occurs "when, during the course of the representation, the attorney's and the defendant's interest diverge with respect to a material factual or legal issue or to a course of action." *Id*. In *Levy*, the Second

-15-

Circuit found that an attorney's prosecution on unrelated criminal charges by the same office prosecuting the defendant presented actual conflict concerns, stating:

> [The attorney] may have believed he had an interest in tempering his defense of [the defendant] in order to curry favor with the prosecution, perhaps fearing that a spirited defense of [the defendant] would prompt the Government to pursue the case against [him] with greater vigor. Though [the attorney] was sentenced before [the defendant's] trial began, the pendency of the charges against [the attorney] created a conflict for the lawyer in properly representing [the defendant] during the pretrial stage of [the defendant's case], as the Government noted in its January 5, 1990, letter.

*Id.* at 156; *see also Thompkins v. Cohen*, 965 F.2d 330, 332 (7th Cir. 1992) (stating that a situation in which the criminal defendant's counsel is under criminal investigation "can create a conflict of interest" because "[i]t may induce the lawyer to pull his punches in defending his client lest the prosecutor's office be angered by an acquittal and retaliate against the lawyer").

"Whenever the court's inquiry reveals that a criminal defendant's attorney in fact suffers from an actual or potential conflict, the court has a subsequent 'disqualifiction/waiver' obligation." *Levy*, 25 F.3d at 153. " If the court discovers that the attorney suffers from a severe conflict—such that no rational defendant would knowingly and intelligently desire the conflicted lawyer's representation—the court is obligated to disqualify the attorney." *Id.* If the conflict is only a potential conflict—"such that a rational defendant could knowingly and intelligently desire the conflicted lawyer's representation"—the court should obtain from the defendant a valid waiver of his right to a non-conflicted lawyer. *Id.* If, however, the court finds that no conflict exists at all, the court has no further obligation. *Id.*

When the court asks the defendant whether he will waive the conflict, the defendant "must be aware of the conflict, realize the consequences to his defense that continuing with counsel under the onus of a conflict could have, and also be aware

-16-

that he has the right to obtain other counsel." *United States v. Levine*, 794 F.2d 1203, 1206 (8th Cir. 1986). Because a defendant may waive his right to counsel, the defendant may also waive the right to counsel free from serious conflicts of interest. *Id*.

Here, after the government advised the district court of Clay's potential conflict of interest, the court properly inquired as to whether a conflict of interest existed. The court determined that the government's investigation of Clay constituted an actual conflict of interest. This finding was reasonable and consistent with *Levy* and *Thompkins* because Clay was the subject of a fraud investigation—the same type of claim for which Edelmann was being prosecuted—by the same United States Attorney's office that prosecuted Edelmann. Under *Lev*y and *Thompkins*, such an investigation would subject Clay to a conflict of interest, whether we refer to it as actual or potential.

After determining a conflict existed, the district court appropriately sought to obtain a waiver from Edelmann. The district court afforded Edelmann a recess to determine whether she would waive the conflict even though Edelmann had been aware of the conflict for over a week. When Edelmann refused to waive the conflict, the district court acted reasonably in removing Clay as Edelmann's counsel.

C. *Request to Proceed Pro Se*

For her third argument on appeal, Edelmann contends that she was denied the fundamental right to represent herself. Edelmann argues that the record does not show she, a paralegal, could not adequately conduct her own defense or that she was unruly.

In response, the government argues Edelmann's request to proceed pro se merely four days before trial was a delay tactic. In addition to Clay, Edelmann had also been represented by attorney Brown for 15 months before trial. Also, Edelmann's motion to proceed pro se was accompanied by other pro se motions that were essentially frivolous.

-17-

While the Sixth Amendment does not explicitly guarantee the right of self-representation, such a right is "necessarily implied by the structure of the Amendment." *Faretta v. California*, 422 U.S. 806, 819 (1975). For the accused to represent himself, however, he must "knowingly and intelligently" forgo the "traditional benefits associated with the right to counsel." *Id.* at 835. While the defendant is not required to have the skill and expertise of a lawyer to intelligently choose to represent himself, he should know the dangers of self-representation, so that the record establishes that he made an informed choice. *Id.*

The right to self-representation, however, is not absolute. *Martinez v. Court of Appeal of Cal.*, 528 U.S. 152, 161 (2000). Once the defendant makes a "clear and unequivocal" request to represent himself, a court may nonetheless deny the request in certain circumstances. First, the defendant must make his request in a timely manner. *Id.* at 162 ("[M]ost courts require [the defendant to make his request] in a timely manner."). The Court in *Faretta* noted that the defendant requested to represent himself "[w]ell before the date of trial" and "weeks before trial," making a clear and unequivocal statement to represent himself. 422 U.S. at 807, 835. Second, the Court in *Faretta* indicated that "the trial judge may terminate self-representation by a defendant who deliberately engages in serious and obstructionist misconduct." 422 U.S. at 834 n.46. Third, because a valid waiver of counsel is a prerequisite for a defendant to represent himself, the Court in *Faretta* recognized the trial court's authority to refuse to permit self-representation when the defendant is unable to "knowingly and intelligently" forgo the "traditional benefits associated with right to counsel." *Id.* at 835.

"[T]herefore, the government's interest in ensuring the integrity and efficiency of the trial at times outweighs the defendant's interest in acting as his own lawyer." *Martinez*, 528 U.S. at 162. "The right [to self-representation] does not exist…to be used as a tactic for delay, for disruption, for distortion of the system, or for manipulation of the trial process." *United States v. Frazier-El*, 204 F.3d 553, 560 (4th Cir. 2000) (internal citations omitted). Trial courts must be allowed "to distinguish

-18-

between a manipulative effort to present particular arguments and a sincere desire to dispense with the benefits of counsel." *Id*. (holding that the district court was justified, when confronted with the defendant's "vacillation between his request for substitute counsel and his request for self-representation," in determining that the defendant proceed with appointed counsel).

The district court denied Edelmann's request to proceed pro se based on two of the three grounds mentioned in *Faretta*. First, the district court found that Edelmann failed to make her request to proceed pro se in a timely manner, stating that he was denying her motion because "five days before this matter [was] scheduled for a jury trial [Edelmann] filed a motion to proceed pro se." Second, the district court indicated its belief that Edelmann was trying to disrupt or delay the start of trial, noting several continuances in the case.

Also, the district court found that Edelmann had (1) utilized Brown, who was "thoroughly familiar with the issues in this case," for several months; (2) sought and received four continuances; (3) requested leave to represent herself approximately four to five days before trial; (4) based her request for self-representation in part on Brown's refusal to respond or file frivolous pleadings; and (5) coupled her request to proceed pro se with several other motions. *See United States v. Mackovich*, 209 F.3d 1227, 1237 (10th Cir. 2000) (utilizing the aforementioned factors in upholding the district court's denial of the defendant's request to proceed pro se). Given the special facts of this case, we hold the district court did not abuse its discretion in denying Edelmann's request to represent herself.

### D. *Rule 404(b) Evidence*

Edelmann's fourth argument is that the three prior convictions offered by the government failed to meet the "close in time" factor required under Federal Rule of Evidence 404(b). In addition, she asserts that the uncharged prior bad act failed to meet the criterion under Rule 404(b) that the evidence be sufficient to support the jury's finding that the defendant committed the other crime. We review the admission

of evidence of prior bad acts for an abuse of discretion. *United States v. Hawthorne*, 235 F.3d 400, 404 (8th Cir. 2000).

Rule 404(b) allows evidence of another crime, wrong, or act to be introduced into evidence unless the sole purpose for offering the evidence is to establish the defendant's propensity for the crime. It is "a rule of inclusion." *United States v. McCarthy*, 97 F.3d 1562, 1572 (8th Cir. 1996) (internal quotations and citation omitted). "When admitted for the purpose of showing intent, the prior acts need not be duplicates, but must be sufficiently similar to support an inference of criminal intent." *United States v. Burkett*, 821 F.2d 1306, 1309 (8th Cir. 1987). A district court may issue a cautionary instruction to the jury to advise it of the purposes for which it may consider such evidence. *Id*.

Rule 404(b) evidence is admissible if it is: "1) relevant to a material issue; 2) similar in kind and close in time to the crime charged; 3) proven by a preponderance of the evidence; and 4) if the potential prejudice does not substantially outweigh its probative value." *United States v. Voegtlin*, 437 F.3d 741, 745 (8th Cir. 2006) (internal quotations and citation omitted). While "other bad acts" under Rule 404(b) are normally thought of as those committed prior to the crime charged, occasionally, "evidence of subsequent acts is admitted for this purpose." *United States v. Vincent*, 681 F.2d 462, 465 (6th Cir. 1982) (citing *United States v. Contreras*, 602 F.2d 1237, 1240 (5th Cir. 1979)).

There is no absolute rule regarding the number of years that can separate offenses. Rather, we apply a reasonableness standard and examine the facts and circumstances of each case. *United States v. Mejia-Uribe*, 75 F.3d 395, 398 (8th Cir. 1996). "Proximity in time and similarity of conduct are only factors tending to negate the possibility that evidence was improperly introduced." *United States v. Wint*, 974 F.2d 961, 967 (8th Cir. 1992) (internal quotations and citation omitted). Ultimately, the question is "whether the evidence is admissible to prove any relevant issue other

than the character of the defendant or his propensity toward criminal activity." *Id*. (internal quotations and citation omitted).

In the present case, the government was required to prove that Edelmann intended to defraud individuals and companies. The government alleged that Edelmann committed fraud through use of the mails by providing false tax returns, false profit and loss statements, and forged and fabricated bank letters and IRS documents. In addition, the government provided evidence that Edelmann submitted forged financial documents to a mortgage broker, a lender, and a title company to secure a loan and purchase property. While the three prior convictions are approximately 15 years old, we find that they are not too remote in time because of their similarities with the crime charged. Just as Edelmann was charged with filing false tax returns and IRS documents in the present case, so too did her first two prior convictions involve her filing a false Currency Transaction Report to conceal her identity to the IRS. Also, her third prior conviction for fabricating court orders to escape from federal custody demonstrates the same method of deception she used in the present case.

As to the subsequent "other bad act" evidence regarding the forging of a court order to have Chris Edelmann's truck released by Equity 1, we find that the government met its burden of proving the "other bad act" by a preponderance of the evidence. First, Chris Becker from Equity 1 testified that he received an Arkansas State Driver's license in the name of Chris A. Edelmann, Edelmann's husband, but bearing a female's picture. He also testified that he thought he was making the loan to a female "Chris," not a male. He stated that he received a fabricated court order from Judge Proctor instructing him to release the truck to a "Chris Edelmann." Second, Judge Proctor testified that he did not sign the order sent to Equity 1 nor did he authorize anyone else to sign the order. Therefore, the jury could draw a reasonable inference from this evidence that "Chris Edelmann" was actually Edelmann herself who forged Judge Proctor's signature to have her truck released.

We note that the limiting instruction the district court gave to the jury as to the Rule 404(b) evidence sufficiently cured whatever unfair prejudice Edelmann may have suffered. Therefore, we hold that the district court did not abuse its discretion in admitting the Rule 404(b) evidence.

## E. *Sufficiency of the Evidence*

In her next argument, Edelmann challenges the sufficiency of the evidence on all five counts for which she was convicted. As to the first mail fraud conviction, she argues that the government failed to present sufficient evidence that the mails were used to further her attempt to obtain the $50,000 loan. As to the second mail fraud conviction, she argues that the government failed to present sufficient evidence that she knew that the closing agent would mail documents back to the lender or that such conduct was reasonably foreseeable. As to the wire fraud conviction, she asserts that no proof exists that interstate, as opposed to intrastate wires, were used or that a scheme to defraud was implemented. She makes this same argument regarding the second wire fraud conviction. Finally, she contends that the money laundering conviction fails because the wire fraud allegation on which it is based is flawed.

When a defendant challenges the sufficiency of the evidence, "we review the evidence in the light most favorable to the government and accept all reasonable inferences that support the jury's verdict." *United States v. Allen*, 440 F.3d 449, 450 (8th Cir. 2006). "We will uphold the verdict if it is supported by substantial evidence, which is evidence from which a reasonable jury could find the defendant guilty beyond a reasonable doubt." *Id*. The standard we employ is a strict one, and we do not lightly overturn a jury's verdict. *Id*.

### 1. *Count I—Mail Fraud*

To establish mail fraud, the government must prove that the defendant: "1) voluntarily and intentionally devised or participated in a scheme to defraud; 2) entered into the scheme with intent to defraud; 3) knew that it was reasonably foreseeable that

the mails would be used; and 4) used the mails in furtherance of the scheme." *United States v. Hively*, 437 F.3d 752, 760 (8th Cir. 2006).

Edelmann argues that Vaughn could not remember receiving a Federal Express package or what that package contained, indicating that the government failed to prove that Edelmann "used the mails." However, the government presented the testimony of four witnesses to establish this element. First, Beard testified that he requested that Vaughn obtain a list of documentation from Edelmann and that the requested documentation be sent by Federal Express. In addition, he testified that Vaughn hand-delivered to him a packet of documents that were responsive to his request.

Second, Vaughn testified that she received via Federal Express further documentation that Beard had requested and that she hand-delivered the documents to Beard. According to Vaughn, in February 2001, she was unable to leave her residence, so a neighbor delivered the Federal Express envelope to her. She identified Government Exhibit 2 as the Federal Express envelope that she received and testified that she sent the original envelope to Agent Dawkins.

Third, the operations manager for Federal Express testified that the markings on Government Exhibit 2 showed that Edelmann sent the package to Vaughn. Additionally, he testified that the employee who generated the mailing label was based at the Little Rock station.

Fourth, Agent Dawkins introduced Edelmann's certified American Express credit card records showing that her American Express card had been charged for mailing the Federal Express envelope to Vaughn. Based on the witnesses' testimony, we hold that the evidence was sufficient to support the jury's verdict as to Count I.

## 2. *Count II—Mail Fraud*

As to Count II, the government was permitted to establish the "use of mails" element of the crime by proving that the mailing was "incident to an essential part of the scheme." *Schmuck v. United States*, 489 U.S. 705, 710–11 (1989). "The statute provides that a defendant must 'cause' the use of mails, but 'a defendant will be deemed to have 'caused' the use of mails . . . if the use was the reasonably foreseeable result of his actions." *United States v. Waterman*, 704 F.2d 1014 (8th Cir. 1983) (quoting *United States v. Wrehe*, 628 F.2d 1079, 1085 (8th Cir. 1980).

Here, Edelmann sought to defraud the lender, BNC, by submitting false financial documents to qualify for a home loan. To obtain the loan, Edelmann had to sign documents at a loan closing, which was overseen by Dianne Cathey at Standard Abstract and Title Company. Cathey testified that during the loan closing, Edelmann reviewed and executed a number of documents, including a settlement sheet. This settlement sheet specifically enumerated a mailing fee of $45 for return of documents to the lender.

Because this settlement sheet provided notice to Edelmann that the documents would be mailed from the title company to the lender to complete the loan, we reject Edelmann's argument that the government failed to present any evidence that she knew or should have reasonably foreseen that the closing agent would mail the documents back to the lender.

## 3. *Count III—Wire Fraud*

"The essential elements of wire fraud are a scheme to defraud, the use of interstate wires incident to the scheme, and an intent to cause harm." *United States v. Frank*, 354 F.3d 910, 918 (8th Cir. 2004).

Edelmann's argument is that the government failed to establish the use of interstate wires, asserting that the evidence demonstrated that only intrastate wires were used, as Richardson caused the Schwab office in Little Rock to wire the funds

to Edelmann's bank account at a Little Rock bank. However, the government presented the testimony of David Fern, a Charles Schwab employee, who testified that Schwab has relationships with various banks across the country who hold their funds in-house. Fern testified that Schwab held Richardson's funds and, in making a transfer, these funds "go from Schwab to the federal wire routing house, and from there . . . to the receiving bank." He explained that the money went through a clearinghouse for wires and that all wired funds go through the Federal Reserve. Fern testified that his branch office in Little Rock does not "hold cash in any way, shape, or form." In addition, the government presented evidence showing that Richardson's request for the wire transfer was made via fax to Schwab's wired funds department in San Francisco. Therefore, the money was sent by Citibank to Superior Federal, with the originator being located in San Francisco and the beneficiary being located in Lonoke, Arkansas.

Additionally, Edelmann argues that the government failed to prove that a scheme to defraud existed because a legitimate debtor-creditor relationship existed between Richardson and Edelmann. The government, however, presented evidence that Edelmann procured the promissory notes through false statements and false documents that she presented to Richardson to entice him to loan her $250,000. Therefore, we find that sufficient evidence exists to support the jury's verdict as to Count III.

### 4. *Count IV—Wire Fraud*

Edelmann argues that the second wire fraud count fails because the government failed to prove a "scheme to defraud" Richardson, as the transactions between Richardson and Edelmann were debtor-creditor transactions properly secured by legitimate promissory notes.

The government, however, offered at least 11 exhibits to substantiate the scheme to defraud Richardson of $250,000 in Count III. In addition, the government submitted approximately eight additional exhibits to show that Edelmann continued

-25-

her scheme to defraud Richardson of an additional $50,000. Richardson testified to the terms of the additional loan and documentation signed by Edelmann that was intended to secure the loan. Therefore, any promissory notes Edelmann signed were a part of her scheme to defraud Richardson and were procured through false representations to Richardson. Therefore, we find that a reasonable trier of fact could conclude that Edelmann engaged in a scheme to defraud Richardson as charged in Count IV.

### 5. *Count V—Money Laundering*

A defendant is guilty of money laundering when he knowingly engages in, or attempts to engage in, "a monetary transaction in criminally derived property that is valued at more than $10,000." *United States v. Mooney*, 401 F.3d 940, 946 (8th Cir. 2005).

Edelmann argues that if the predicate offense of wire fraud fails, so too must the money laundering conviction. However, because the evidence is sufficient to support her conviction for wire fraud in Counts III and IV, her challenge to Count V also fails.

### F. *Prison Records*

Edelmann's sixth argument on appeal is based on the government's introduction of Exhibits 57, 57A, 57B, and 57C, which consisted of a memorandum to file written by Donna Wilson, Inmate Systems Manager at a federal correctional institution in Lexington, Kentucky, and copies of three court orders purporting to release Edelmann. The memorandum, describing only the events of July 26, 1989, discusses the three court orders and their contents; states Wilson's disposition of the orders once she received them; and explains Wilson's response when she was informed that the orders were fraudulent.

Edelmann argues that the district court erroneously admitted, in violation of Federal Rule of Evidence 803(8)(B)[4], Wilson's "investigative reports" containing records of interviews, findings, and conclusions regarding whether Edelmann forged court orders.

"We review for clear abuse of discretion a district court's evidentiary rulings." *United States v. Chase*, No. 05-2070, 2006 WL 1805974, at *3 (8th Cir. July 3, 2006).

Rule 803(8)(B) does not bar the admission of all law enforcement agency records. *United States v. Dancy*, 861 F.2d 77, 79 (5th Cir. 1988). "Rather, the rule excludes records that report the observation or investigation of crimes, not records that merely document routine, unambiguous factual matters." *Id*. Information that "is unrelated to a criminal investigation" is admissible under Rule 803(8). *Id*.

Here, Wilson is not a police officer or a member of law enforcement; instead, she is an Inmate Systems Manager who produced the memorandum in the normal course of her duties. The memorandum does not contain any opinions, findings, or conclusions; it is a record of events communicated to Wilson and recorded contemporaneously with the events. It was part of Edelmann's file records at the prison. In addition, Wilson testified that she had no involvement with the disciplinary proceedings that resulted from the incident.

---

[4]Federal Rule of Evidence 803(8)(B) provides:

The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

(8) Public records and reports. Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth . . . (B) matters observed pursuant to duty imposed by law as to which matters there was a duty to report, excluding, however, in criminal cases matters observed by police officers and other law enforcement personnel . . . .

Because Wilson does not qualify as a police officer or other law enforcement personnel, Rule 803(8)(B) does not apply to the memorandum Wilson created. In addition, even if we were to conclude Wilson did qualify as a law enforcement officer, Wilson did not write the memorandum in the course of investigating a crime; instead, she wrote the memorandum as a part of her routine duties as the Inmate Systems Manager. Therefore, we find that the district court did not abuse its discretion in admitting the prison records into evidence.

### G. *Forfeiture Award*

Next, Edelmann contends that the district court was without authority to amend the judgment to include a missing forfeiture award because the failure to include such an order is not a "clerical" error but a judicial or attorney error.

We previously addressed this issue in *United States v. Hatcher*, 323 F.3d 666 (8th Cir. 2003). We stated:

> After seven days, the court retains the power only to correct clerical errors. Fed. R. Crim. P. 36. Mr. Porrello argues that adding a forfeiture order constitutes more than a correction of a clerical error. If the judge had never before addressed the forfeiture issue, we might agree with Mr. Porrello. In light of the Court's earlier entry of a preliminary forfeiture order, however, we conclude that the omission did constitute a clerical error. See *United States v. Loe*, 248 F.3d 449 (5th Cir. 2001) (holding that a judge who failed to include a final forfeiture order in the formal written sentencing could amend that judgment as a clerical error when he had already entered a preliminary forfeiture order and indicated at the sentencing hearing that he would include that order in the judgment). Because the error was clerical, the District Court retained jurisdiction to correct it. We thus find no error in the District Court's entry of the forfeiture order.

*Id*. at 673.

Because the district court entered a preliminary order on July 13, 2004, and a Final Judgment of Forfeiture on October 22, 2004, its omission of the forfeiture in its final judgment on July 20, 2005, was a clerical error that the district court retained jurisdiction to correct.

### H. *Calculation of Offense Level and Reasonableness of Sentence*

Edelmann's final argument on appeal is that the district court committed several errors in calculating her offense level and criminal history, resulting in an unreasonable sentence. We review the district court's application of the Guidelines de novo and its findings of fact for clear error. *United States v. Lindquist*, 421 F.3d 751 (8th Cir. 2005).

### 1. *More Than One Victim*

Edelmann first asserts that the district court erred in applying a two-level enhancement for defrauding more than one victim under § 2F1.1(b)(2)(B) of the 2000 Guidelines.[5] Section 2F1.1(b)(2)(B) of the 2000 Guidelines states that "[i]f the [fraudulent] offense involved . . . (B) a scheme to defraud more than one victim, increase by 2 levels." While Edelmann argues that there was not one scheme to defraud multiple victims but three separate schemes, each with one victim, the government presented evidence that Edelmann used her business as a front to swindle three different parties out of money within a very short time frame.

First, Edelmann used similar business records in her scheme to defraud Victor Beard, Thomas Richardson, and BNC, such as false profit and loss statements, tax records, bank statements and letters, and documents relating to her anticipated earnings from an overseas training program. Second, Edelmann perpetrated the frauds on Beard, Richardson, and BNC within a three-month period. Third, the fraud of Richardson and BNC took place within the same time frame and for the same purpose. Edelmann submitted false statements to the loan company to qualify for a home loan

---

[5]Edelmann was sentenced under the 2000 version of the Guidelines. Section 2F1.1 no longer exists under the current version of the Guidelines.

of $125,000. To complete the transaction, she had to bring a sum of $102,825.08 to closing on March 9, 2001. Edelmann gave excuses to the title company as to why she did not have the down payment money on the closing date. Two days later, Edelmann asked Richardson if she could borrow $250,000 from him. The next day, Richardson agreed to lend the money to Edelmann, requesting that Schwab issue a $102,825.08 check to Edelmann. Edelmann then negotiated the check on March 13, 2001, turning it into a Bank of America cashier's check that she presented to the title company on March 13, 2001, to close the loan. Therefore, we find that the schemes to defraud Richardson and the mortgage company were inextricably intertwined, establishing that Edelmann defrauded more than one victim.

Accordingly, we hold that the district court properly applied the two-level enhancement.

## 2. *Charitable Organization*

Next, Edelmann argues that the district court erred in applying the two-point enhancement for representing to the victims that she needed money for a charitable organization because her business was a for-profit business and none of the victims were motivated by a humanitarian desire to loan her money.

Section 2F1.1(b)(4)(A) of the 2000 Guidelines provides that "[i]f the offense involved (A) a misrepresentation that the defendant was acting on behalf of a charitable, educational, religious or political organization, or a government agency . . . increase by 2 levels."

Here, the government presented evidence that, in seeking "bridge loans" from Beard and Richardson, Edelmann represented her business as a non-profit, humanitarian project providing legal services to indigent criminal defendants. In addition, she represented to them that she was in the process of gaining primary funding for her project through another source. She promised them that if they loaned her the money, they would receive high returns on their bridge loans when her primary

investment source paid out. Also, she submitted a letter to Beard and Richardson from John Contrill stating that she would receive $2,000,000 a week for 40 weeks and that part of this money would be used for humanitarian projects.

Based on Edelmann's representations to Beard and Richardson, we hold that the district court committed no error in applying the two-point enhancement.

### 3. *Sophisticated Means*

Edelmann also contends that the district court erred in applying a two-point enhancement for using sophisticated means under § 2F1.1(b)(6)(C) under the 2000 Guidelines because she only made simple false statements in applying for loans; created false documents that were easy to generate; copied forms from the IRS website that are easily accessed; and ran a real, as opposed to fictitious, entity. In addition, she notes that she never utilized corporate shells or offshore bank accounts, indicating a lack of sophistication.

Section 2F1.1(b)(6)(C) of the 2000 Guidelines provides that "[i]f . . . (C) the offense otherwise involved sophisticated means, increase by 2 levels." A district court commits no error in applying the two-point enhancement for sophisticated means where the defendant's "total scheme was undoubtably sophisticated." *United States v. Halloran*, 415 F.3d 940, 945 (8th Cir. 2005). In *Halloran*, the defendant advertised on the Internet the sale of a mortgage for a piece of property that he did not own. *Id.* at 942. To foster the sale of the mortgage, the defendant provided a mortgage broker with fraudulent documents purporting to show that the defendant had a valid mortgage to sell. *Id.* The defendant had created these fraudulent documents using his typewriter. *Id.* The fraudulent documents included a purchase agreement, down payment check from a fabricated buyer, and a fictitious bank deposit slip. *Id.* The defendant appealed the district court's two-point enhancement to his sentence, arguing that his mortgage scheme did not involve the use of sophisticated means because he simply used a typewriter to forge the documents. *Id.* at 945. In rejecting the defendant's argument, we noted that while certain aspects of the defendant's scheme were not complex or

-31-

intricate, the total scheme was sophisticated. *Id*. The defendant's scheme was not a single fraudulent act, "but a complex series of fraudulent transactions." *Id*. We found that to accomplish his "multi-layered plot," the defendant "required the use of a corporate entity, numerous false documents and forged notary stamps. His elaborate scheme also required him to manipulate official property records by recording fictitious transfers of property and to exploit numerous individuals by forging their signatures on various fraudulent documents." *Id*.

As in *Halloran*, Edelmann created and used numerous false documents, including multiple years of federal tax returns, supporting federal tax documents, such as W-2 and 1099 forms, bank statements (created from whole cloth), Articles of Incorporation from the Arkansas Secretary of State, profit and loss statements, and a series of bank letters. Collectively, these false documents demonstrate that Edelmann used sophisticated means.

#### 4. *Abuse of Position of Trust*

Edelmann's next argument is that the district court erred in applying a two-point enhancement for abuse of a position of trust under § 3B1.3 of the 2000 Guidelines. However, the district court never actually applied the two-level enhancement for abuse of position of trust; it merely noted that it was a close question in this case.

#### 5. *Obstruction of Justice*

Edelmann asserts that the district court erroneously applied the obstruction of justice enhancement based on her failure to appear for sentencing on November 10, 2002, because she was not actually sentenced until July 15, 2005, a hearing at which she was present.

Section 3C1.1 of the 2000 Guidelines provides:

> If (A) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the course of the investigation, prosecution, or sentencing of the instant offense of conviction, and (B) the obstructive conduct related to (i) the defendant's offense of conviction and any relevant conduct; or (ii) a closely related offense, increase the offense level by 2 levels.

In the present case, Edelmann agreed to turn herself in to the custody of the United States Marshals Service on November 10, 2004, in exchange for the government not seeking immediate pre-trial detention on the new charges brought against her. Edelmann entered a plea to the new charges on November 9, and was instructed by the court to turn herself in on November 10, 2004. Edelmann failed to follow the district court's instructions to surrender to the United States Marshals Service by noon on November 10, 2004. As a result, the district court issued an arrest warrant. Edelmann was arrested on November 29, 2004, when she was found hiding in a closet at her residence. At sentencing, Deputy United States Marshal Patti Watson testified about the government resources required to bring Edelmann into custody on the active warrant.

We find that these facts constitute sufficient evidence that Edelmann willfully obstructed justice by defying the district court's instruction that she appear for sentencing on November 10, 2004, and justified enhancing Edelmann's sentence for obstruction of justice.

### 6. *Additional Criminal History Point*

Edelmann also argues that the district court erred in adding one criminal history point for her guilty plea in a separate criminal case in the Eastern District of Arkansas. At the time of her sentencing in the instant case, Edelmann had entered a guilty plea in her other case but filed a motion to withdraw the plea. That motion has now been

denied and the guilty plea stands. Therefore, the question of whether the district court erroneously applied the additional criminal history point is moot.

### 7. *Reasonableness of the Sentence*

Having rejected each of Edelmann's contentions that the district court erred in applying sentencing enhancements and recognizing that Edelmann has advanced no other arguments as to why her sentence is unreasonable, we hold that Edelmann's sentence of 92 months' imprisonment is reasonable.

### III. *Conclusion*

Accordingly, for the reasons stated above, we affirm the judgment of the district court in all respects.

_____