*555 OPINION OF THE COURT
Judith S. Lies, J.
The issue presented in this case is whether a defendant forfeits his right to self-representation when he feigns an inability to speak and hear. At an evidentiary hearing held in connection with this issue, an examining psychologist expressed the opinion that the defendant was pretending to have such disabilities “as a means to interfere with the efficient resolution” of these proceedings. Based on the psychologist’s testimony and his reports, which were admitted as exhibits at the hearing, the court finds that the defendant has engaged in intentional conduct that “is calculated to undermine, upset or unreasonably delay the progress of the trial.” (People v McIntyre, 36 NY2d 10, 18 [1974].) As a result, the defendant has forfeited his right to self-representation.
On April 26, 2011, following the evidentiary hearing, the court orally announced its conclusion that the defendant had forfeited his right to self-representation and stated that it would issue a written decision with its formal findings of fact and conclusions of law. This is the court’s written decision.
Procedural History
1. Background
On May 7, 2008, the defendant was arrested and charged with assault in the second degree, criminal contempt in the first degree and related charges under docket No. 2008BX029166 stemming from incidents that allegedly occurred on October 23, 2006, April 30, 2008 and May 5, 2008. He was also charged with robbery in the first degree and related charges under docket No. 2008BX029167 for an incident that allegedly occurred on June 12, 2007, involving a different complainant. Finally, the defendant was charged with assault in the second degree and related charges under docket No. 2008BX029168 for acts he allegedly committed at the time of his arrest. Thomas Tibaldi, Esq., was assigned pursuant to articlel8-B of the County Law to represent the defendant on all three dockets.
On May 23, 2008, under indictment No. 1826-08, the defendant was charged with assault in the second degree, criminal contempt in the first degree and related charges in connection with the allegations of criminal conduct on October 23, 2006, April 30, 2008 and May 5, 2008. On May 30, 2008, under indictment No. 2052-08 (the instant matter), the defendant was charged with robbery in the first degree and related charges in *556 connection with the alleged June 12, 2007 incident, and assault in the second degree and related charges in connection with the alleged May 7, 2008 incident. Both matters were handled together at the calendar calls. On July 15, 2008, Mr. Tibaldi asked to be relieved from the representation of the defendant. After that application was granted, on July 21, 2008, Eli Moore, Esq., was assigned to represent the defendant on both matters.
Upon his arrest on May 7, 2008, the defendant maintained to law enforcement personnel and through counsel to the court that he was unable to hear and speak. For initial calendar calls, the court utilized the services of a sign language interpreter. On March 30, 2009, counsel informed the court, however, that the interpreter had stated to him that the defendant did not know any commonly used sign language and that they communicated through gestures and the defendant’s reading lips. Counsel requested that the court provide the defendant at trial with the services of a “real-time” reporter,[1] so that the defendant could read the proceedings on a computer screen as they were being transcribed by the court reporter.
On April 6, 2009, the court ordered the defendant to undergo a competency examination pursuant to CPL 730.30 because of a concern that the defendant did not understand the proceedings.[2] By separate reports dated May 13, 2009, two examiners— Dr. Melissa Kaye, a forensic psychiatrist, and Dr. Barry Winkler, a forensic psychologist — found the defendant fit to proceed with the criminal actions. As discussed below, both examiners concluded that the defendant likely was feigning his inability to hear and speak.[3] In the absence of a motion for a hearing on the defendant’s fitness, on May 27, 2009, the court directed that the criminal actions proceed against the defendant as required under CPL 730.30 (2).
*557 The trial under indictment No. 1826-08 proceeded first. In September 2009, the defendant, represented by Mr. Moore, was found guilty after a jury trial held before this court of one count of assault in the second degree, two counts of aggravated criminal contempt, and two counts of endangering the welfare of a child. During the trial, the court provided “real-time” reporting to the defendant, who communicated with his attorney through handwritten notes. The defendant was sentenced to a term of imprisonment of seven years, followed by three years of post-release supervision on the assault count to run concurrent with an indeterminate sentence of to 7 years’ incarceration on the two aggravated criminal contempt counts and one year jail on the two endangering counts.
Thereafter, the prosecution of the defendant continued with respect to the pending robbery indictment (charged under indictment No. 2052-08). The court continued to provide the services of a “real-time” reporter during calendar calls. Shortly after his conviction, the defendant requested new counsel with respect to that indictment, and the court granted the application. On December 4, 2009, Douglas Kahan, Esq., was assigned to represent the defendant. That same day, the defendant advised the court by letter that he wished to represent himself. When the court asked the defendant to take some time to consider his request, the defendant agreed and, on a subsequent date, requested an adjournment for that purpose. On February 3, 2010, however, the defendant informed the court that he was reiterating his request to represent himself.
Accordingly, on that date, as mandated by our Court of Appeals in People v Arroyo (98 NY2d 101 [2002]), the court advised the defendant that he had the right to represent himself and further advised the defendant of the dangers of self-representation. (See generally People v McIntyre, 36 NY2d 10 [1974].) As required by People v Sawyer (57 NY2d 12 [1982]), and its progeny, the court conducted a “searching inquiry” to determine whether the defendant was making a knowing, voluntary and intelligent waiver of the right to counsel. (See People v Sawyer, 57 NY2d 12 [1982]; see also People v Arroyo, 98 NY2d at 103-104; People v Slaughter, 78 NY2d 485 [1991].) After thoroughly discussing the matter with the defendant, this court made findings with respect to two prongs of the McIntyre test — specifically, that the defendant had made an unequivocal and timely request to represent himself and that he had made a knowing, voluntary and intelligent waiver of his right to counsel. The *558 court, however, deferred making a finding with respect to the third McIntyre prong — whether the defendant had “engaged in conduct which would prevent the fair and orderly exposition of the issues” {McIntyre, 36 NY2d at 17), advising the parties that it would permit the defendant to represent himself unless and until the People made an application for a hearing on that issue, and the court made a finding that the defendant had engaged in such conduct.
The court thus permitted the defendant to represent himself, but at the February 3, 2010 hearing, directed Mr. Kahan to assist the defendant as “stand-by” counsel. At calendar calls,[4] the court continued its practice of having a reporter transcribe the proceedings in “real time.” Because most of our court reporters are not skilled in “real-time” reporting, this procedure required the court usually to arrange for a second reporter for the calendar call for the defendant’s case. In order to convey his thoughts to the court, the defendant wrote notes in longhand that Mr. Kahan read into the record. On a typical calendar day, this court hears about 60 to 70 cases, and each case is generally handled within about five minutes. A calendar call with this defendant, however, routinely took 30 minutes and occasionally took as long as two hours as the defendant slowly and deliberately wrote notes that were read to the court. As a result of these cumbersome mechanics, calendar calls that should have taken a few minutes stretched over such extensive periods of time that the court was required to handle proceedings on an afternoon set aside for that purpose, rather than during its regularly-scheduled calendar day.
On October 27, 2010, the People requested a second CPL 730.30 competency examination, stating that the defendant appeared confused, was allegedly engaging in bizarre behavior and seemed to be delusional. The People also noted that the defendant had been refusing to cooperate with counsel for many months. On December 20, 2010, the court advised the parties that Dr. Kaye, the forensic psychiatrist, had asked the court to order the defendant to undergo certain physical tests to assist her in her evaluation. The court further advised the parties that unless they objected, it would grant the doctor’s request. The *559 defendant stated that he did not wish to be heard, and Mr. Kahan noted that the defendant had indicated that he would cooperate with the doctors. Accordingly, by order dated December 20, 2010, this court ordered the Director of Bellevue Hospital Center to perform the following examinations requested by Dr. Kaye: a head imaging study, an audiology examination, a neurological examination, and a speech and swallowing evaluation.
By reports dated March 15, 2011, the two examiners, Dr. Winkler and Dr. Kaye, again found the defendant fit to proceed to trial and, as discussed below, concluded that the defendant was feigning his inability to hear and speak. Again, in the absence of a motion for a hearing as to the defendant’s fitness, pursuant to CPL 730.30 (2), the court directed that the criminal action against the defendant proceed.
On April 1, 2011, the People requested that the court hold an evidentiary hearing to assist it in determining whether the defendant had engaged in conduct that would constitute a forfeiture of the right to self-representation under McIntyre’s third prong. The court agreed to proceed with a hearing. In so doing, the court expressed its concern that the procedures employed to communicate with the defendant during calendar calls as a result of his claim that he could not hear or speak were “exceptionally cumbersome.” The court stated that if the defendant truly could not hear or speak, then it would accommodate whatever procedures were necessary at whatever pace was necessary and any delay was unfortunate but unavoidable. The court further stated that if the defendant was able to hear and speak and was faking these conditions, then his ruse could support a finding that the defendant’s conduct would prevent the fair and orderly exposition of the issues and unduly delay the proceedings such that the defendant had forfeited his right to self-representation. After confirming that the defendant understood the purpose of the hearing, the court advised him that he was entitled to call witnesses or take the stand during the hearing if he so chose.
2. The Hearing
On April 26, 2011, the court held an evidentiary hearing.
At the hearing, the People called one witness to testify: Dr. Barry Winkler. Dr. Winkler testified in substance and in relevant part as set forth below. The court credits the testimony of Dr. Winkler in full. The defendant did not call any witnesses at the hearing.
*560 Dr. Winkler has been employed as a licensed clinical psychologist at Bellevue Hospital Center for six years. (Tr at 6.)[5] He holds a doctoral degree in clinical psychology, a Master’s degree in forensic psychology, and a Juris Doctor from Fordham University School of Law. (Id.) Dr. Winkler holds teaching appointments at the New York University School of Medicine and the New York University Graduate School of Arts and Science in the Department of Psychiatry. (Tr at 7.)
Dr. Winkler serves as the Deputy Director of the Bronx Court Clinic, which is a satellite clinic of Bellevue Hospital Center. As part of his duties, he has performed over 700 psychological legal evaluations on people accused of crimes. (Tr at 8.) He has been qualified to testify as an expert in the field of forensic psychology one time in federal court and five times in Bronx County, Supreme Court, and has never been denied such qualification. (Tr at 8.) Upon application of the People, this court deemed Dr. Winkler an expert in the field of forensic psychology. (Tr at 9.)
Dr. Winkler conducted two competency examinations on the defendant, first in 2009 and again in October 2010. [6] (Tr at 16-17.) Dr. Melissa Kaye served as the second examiner on both occasions. (Tr at 16-17, 23-24.)
During the 2009 examination, the defendant told Dr. Winkler and Dr. Kaye that he had lost the ability to hear and speak after he fell off a roof three or four years earlier. The defendant further informed the doctors that he had not received any medical treatment as a result of the injuries suffered in that fall. (Tr at 25; People’s exhibit 3.) Dr. Winkler and Dr. Kaye met with the *561 defendant on both occasions with a sign language interpreter. The interpreter advised the doctors, in 2009, that the defendant did not communicate with her in any version of sign language in which she had trained or that she had ever encountered. The interpreter used gestures to communicate the doctors’ questions and, at times, the defendant would respond to the doctors through gestures. (Tr at 17-18.)
In his 2009 report, Dr. Winkler wrote:
“Mr. Gabriel appears to be feigning hearing and speech deficits. According to the interpreter, he does not communicate in any recognized form of sign language or other hearing-impaired communication. The fact that the defendant could speak before his reported recent hearing loss is also inconsistent with his current inability to produce sound of any kind. He also responds to several questions without waiting for the interpreter to sign, and without seeing the examiners mouth the words.” (People’s exhibit 3 at 2.)
Finally, Dr. Winkler noted that an injury that would cause a person to lose the ability to speak and hear “would typically produce other severe cognitive and physical deficits that are not displayed by the defendant.” {Id. at 4.)
More specifically, as Dr. Winkler testified at the hearing, a fall could damage a person’s ability to hear and speak, but in order to cause such damage, the fall would need to involve an extremely severe traumatic brain injury that would present itself “in global deficits.” Thus, a person who suffered such damage could also lose such skills as the ability to walk, understand simple commands and take care of oneself. Indeed, such a person would likely require institutionalization or assistance with the activities of daily living, yet the defendant suffered no such “global deficits.” To the contrary, during his interviews with the defendant, Dr. Winkler saw no evidence of such brain damage. Had it existed, such damage could have been reflected in a delay or other deficit in responding to the doctors’ questions, an inability to write, an inability to formulate responses to questions, or unusual movement, yet the defendant acted normally and responded to the doctors’ questions appropriately. (Tr at 24-26, 33-37; People’s exhibit 3.) In addition, records of the Bellevue Hospital Center from the defendant’s admission between January 25 and 28, 2011, specifically noted the absence of any global deficits. (Tr at 26; People’s exhibit 1.) *562 As part of his 2010-2011 evaluation, Dr. Winkler reviewed a discharge summary, dated January 28, 2011, of the Bellevue Hospital Center prepared at the end of the defendant’s admission to that hospital. (Tr at 12-15; People’s exhibit 1.) He also reviewed a report of a neurological examination, dated January 26, 2011, conducted at the Bellevue Hospital Center pursuant to this court’s order dated December 20, 2010. (Tr at 15; People’s exhibit 2.) According to the records, the defendant submitted to a neurological examination, but on two occasions— once at the hospital and once at Hikers Island — he refused to undergo a head CT scan, an audiology examination and a speech and swallowing examination. (Tr at 18-19, 21.)
According to the report of the neurological examination, the defendant’s inability to speak reflected a lack of effort, not a neurological dysfunction. When the examiner asked the defendant to speak, he did not move his palate, yet other testing demonstrated that he was capable of moving his palate. His purported inability to speak did not reflect cerebral dysfunction and his writing reflected normally functioning language centers. The defendant’s claim that he could not whistle was “inexplicable,” as whistling does not require language function nor vocal cord contraction. The examiner saw no evidence of dissymmetry or an inability to move his face. Finally, the examiner noted that although the defendant claimed to be deaf, he “intermittently responded to verbal commands and localized to voice.” (Tr at 20-21, 31-32; People’s exhibit 2.)
It is possible for a person to have a delusion that he or she cannot speak and hear. Dr. Winkler formed the opinion, however, that the defendant did not suffer from such a delusion based on several factors. First, a delusion is constant; yet, records the doctor reviewed in connection with his 2010 evaluation, including records of the New York City Department of Correction from Rikers Island in 2008 and 2009 and Downstate Correctional Facility in 2010, include references to instances when the defendant spoke and appeared to hear. In addition, the defendant, who is in his 30s, denied ever having received any psychological treatment, yet, delusional disorders normally develop in a person’s late teens or early 20s. Moreover, the defendant’s claim that he could not hear or speak arose in the context of a serious legal situation, which suggests that the defendant is malingering. Finally, he has refused attempts to determine his physical ability to hear, which is more consistent with malingering than with a delusional disorder. (Tr at 27-28.) *563 In addition, Dr. Winkler was not aware of any psychological condition that as a direct result could cause a person to lose his or her ability to speak and hear. (Tr at 30-31.)
In sum, Dr. Winkler diagnosed that the defendant was “malingering his speech and hearing deficits.” (Tr at 33.) “Malingering,” which is a recognized diagnosis (Tr at 33), means the “intentional production or exaggeration of mental or physical symptoms for some type of secondary gain.” (Tr at 28.) In particular, Dr. Winkler determined that
“Mr. Gabriel is malingering hearing and speech deficits as a distraction to his current legal situation as a means to interfere with the efficient resolution of that situation. And I believe part of his motivation is to also necessitate the expenditure of a tremendous amount of time and resources by various agencies, which he has accomplished. And I believe that ultimately it’s intended in that way to delay an eventual resolution of this case.” (Id.; see also People’s exhibit 4.)
3. The Court’s Findings of Fact
The court credits the testimony of Dr. Winkler in full and adopts his testimony, and the accompanying exhibits, as its findings of fact. Based on Dr. Winkler’s testimony, the court finds that the defendant is feigning an inability to speak and hear as a tactic to delay the progress of the proceedings with respect to indictment No. 2052-2008 and that his conduct will prevent the fair and orderly exposition of the issues faced in further pretrial proceedings and at trial.
Discussion
The Sixth and Fourteenth Amendments to the United States Constitution guarantee a defendant in a criminal trial not only the right to proceed with counsel (see Gideon v Wainwright, 372 US 335 [1963]), but also the right to proceed without counsel when the defendant clearly asserts his or her right in a timely manner and knowingly, intelligently and voluntarily chooses to do so. (Faretta v California, 422 US 806 [1975]; see also Martinez v Court of Appeal of Cal., Fourth Appellate Dist., 528 US 152, 162 [2000] [“most courts require (a defendant to make the request) in a timely manner”].) The right to represent oneself, however, is not absolute. The right to self-representation does not include the “[right] to abuse the dignity of the courtroom,” nor the right to “engag[e] in serious and obstructionist *564 misconduct.” (Faretta, 422 US at 835 n 46.) Put another way, the right to self-representation is not to be used “as a tactic for delay, for disruption, for distortion of the system, or for manipulation of the trial process.” (United States v Mosley, 607 F3d 555, 558 [8th Cir 2010], quoting United States v Edelmann, 458 F3d 791, 808-809 [8th Cir 2006]; see also United States v Frazier-El, 204 F3d 553, 560 [4th Cir 2000].) These limitations are necessary because “[e]ven at the trial level . . . the government’s interest in ensuring the integrity and efficiency of the trial at times outweighs the defendant’s interest in acting as his own lawyer.” (Martinez v Court of Appeal of Cal., Fourth Appellate Dist., 528 US 152, 162 [2000] [holding that a criminal defendant has no federal constitutional right to self-representation on direct appeal].)
The New York State Constitution likewise recognizes a defendant’s right to self-representation. (People v McIntyre, 36 NY2d 10 [1974], citing NY Const, art I, § 6 [“In any trial in any court whatever the party accused shall be allowed to appear and defend in person and with counsel”].) The right to self-representation under New York law is likewise not unlimited. Our Court of Appeals has held that a defendant must be permitted to invoke his or her right to self-representation, “provided: (1) the request is unequivocal and timely asserted, (2) there has been a knowing and intelligent waiver of the right to counsel, and (3) the defendant has not engaged in conduct which would prevent the fair and orderly exposition of the issues.” {Id. at 17.) In elaborating on the third prong, the Court of Appeals wrote that a defendant may forfeit the right to self-representation by “engaging in disruptive or obstreperous conduct.” {Id. at 18 [citations omitted].) Further, “[w]hen a defendant’s conduct is calculated to undermine, upset or unreasonably delay the progress of the trial he forfeits his right to self-representation.” {Id.)
Thus, for example, in People v Cooks (28 AD3d 362, 363 [1st Dept 2006]), the Appellate Division, First Department, upheld the trial court’s decision to revoke permission for a defendant to represent himself, where the “defendant [had been] disruptive, feigned mental illness, feigned physical ailments and repeatedly asked to leave the courtroom and claimed illness when summoned back.” Similarly, the Appellate Division, Third Department, held in People v Thomas (73 AD3d 1223, 1224 [3d Dept 2010]), that a trial court properly denied a defendant his right to self-representation, not only because he failed to waive his *565 right intelligently, but also because a fair and orderly trial would not be feasible, in light of the defendant’s position that, among other things, he was entitled to absolute immunity because he was “Almighty God” and “King of the United States,” and that he had been born on a day the earth spun backwards. That Court also upheld the decision of another trial judge, who concluded that a defendant had forfeited his right to self-representation, when the defendant became belligerent and criticized the court, demanded a change of venue and stated that he would defend himself from his cell. (People v Gilbo, 52 AD3d 952 [3d Dept 2008].)
In the instant matter, as testified to by Dr. Winkler, the defendant has engaged in a course of conduct — feigning an ability to speak and hear — over the course of three years with the intent to delay the criminal proceedings pending against him. The defendant’s ruse has resulted in the delay of individual calendar calls because of the cumbersome accommodations, and his ruse has resulted in the delay of the start of trial, because it necessitated extensive examinations and an evidentiary hearing. Based on the prolonged length of the calendar calls, if the court were to continue to provide “real-time” reporting and allow the defendant, representing himself, to communicate with the court through handwritten notes, a trial that should last about two weeks could stretch to two months or beyond. Every stage of the trial — jury selection, opening statements, examination of witnesses, argument over evidentiary issues, charging conference, summations — would suffer from needless extreme delay.
If the defendant were not feigning his inability to speak and hear, the court would be required to “reasonably accommodate” his needs through whatever means necessary, even if such means dramatically lengthened the duration of the trial. (See Americans with Disabilities Act of 1990 [ADA], 42 USC § 12101 et seq.; cf. People v Caldwell, 159 Misc 2d 190 [Crim Ct, NY County 1993] [court system required under ADA to make all of its services available to persons with disabilities], affd on other grounds 172 Misc 2d 382 [App Term, 1st Dept 1997].) Further, if the defendant caused a delay in the proceedings simply through unskilled lay participation, the court would not be permitted to withhold the defendant his right to self-representation on that basis. (See e.g. Matter of Kathleen K. [Steven K], 17 NY3d 380, 385 [2011] [“That a defendant lacks legal skill or knowledge is not a preclusive bar to self-repre *566 sentation”].) The defendant’s conduct, however, is intentional and with no purpose other than to cause delay. This court will not burden a jury, the witnesses, the lawyers or our overstressed court system with a prolonged trial merely to accommodate a malingering defendant whose goal is to interfere with the efficient administration of his trial. McIntyre is clear: “When a defendant’s conduct is calculated to undermine, upset or unreasonably delay the progress of the trial he forfeits his right to self-representation.” (36 NY2d 10, 18.) Because this court finds that the defendant’s conduct is calculated to unreasonably delay the proceedings and is preventing the fair and orderly exposition of the issues, it concludes that the defendant has forfeited his right to self-representation.
This court has advised the defendant that should he abandon his ruse before the trial commences, this matter can be revisited.

. A “real-time” reporter takes stenographic notes, which are converted by a computer program almost simultaneously into actual words that can be read on a computer screen.

. In its order dated April 6, 2009, the court conveyed the following information to the examiners that had been provided to it by defense counsel: “Defendant became deaf and mute in 2005 due to a fall from a roof. Unclear how much defendant is understanding. Is there brain damage?” The order was issued under indictment No. 1826-08, but the court intended the findings to apply to both dockets.

. In her report dated May 13, 2009, Dr. Kaye wrote, “His deaf mute presentation is medically inconsistent and highly suggestive of feigned deficits.” (Report of Melissa Kaye, M.D., dated May 13, 2009, at 2.) Dr. Winkler likewise expressed the opinion in his report that “Mr. Gabriel appears to be feigning hearing and speech deficits.” (Report of Barry Winkler, J.D., Psy. D., dated May 13, 2009, at 2.)

. Calendar calls involved discovery matters and motion practice. The defendant requested numerous adjournments to consider whether to file motions, and, later, whether to adopt counsel’s motions instead. The People also requested adjournments to review records to decide whether they would apply for a hearing under the third McIntyre prong.

. The notation “Tr” refers to the page number of the transcript from the April 26, 2011, hearing.

. This court is mindful that CPL 730.20 (6) provides:
“When a defendant is subjected to examination pursuant to a [CPL 730.30] order . . . , any statement made by him for the purpose of the examination or treatment shall be inadmissible in evidence against him in any criminal action on any issue other than that of his mental condition, but such statement is admissible upon that issue whether or not it would otherwise be deemed a privileged communication.”
The defendant’s mental condition was at issue in this hearing — specifically, the court addressed whether the defendant was malingering (a psychological diagnosis), was delusional, or actually could not hear and speak because of physical or mental disease. (See generally People v McNamee, 145 Misc 2d 187 [Sup Ct, NY County 1989] [holding that two psychiatrists who had examined the defendant pursuant to CPL 730.30 were not barred from testifying about the defendant’s criminal responsibility for the charged crimes at trial based on observations and opinions gleaned during their CPL 730.30 examinations of the defendant].)