# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 08-2413

_____

|  |  |  |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the Western |
| | * | District of Missouri. |
| Cortez L. Williams, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: May 14, 2009
Filed: August 20, 2009

_____

Before WOLLMAN, JOHN R. GIBSON, and MURPHY, Circuit Judges.

_____

JOHN R. GIBSON, Circuit Judge.

Cortez L. Williams was convicted by a jury of one count of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1) and sentenced to forty-six months' imprisonment and three years' supervised release. Before trial, the district court[1] denied Williams's motions to suppress evidence and to dismiss the indictment. Williams appeals his conviction, arguing that the district court erred in denying his motion to suppress the firearm because the officers who arrested him

_____

[1] The Honorable Scott O. Wright, United States District Judge for the Western District of Missouri, adopting the Reports and Recommendations of the Honorable Robert E. Larsen, United States Magistrate Judge for the Western District of Missouri.

impermissibly conducted a protective sweep of his home. Williams also contends that the district court erred in denying his motion to dismiss the indictment because the firearm was destroyed before trial in violation of his Fifth Amendment rights. We affirm.

I.

On July 26, 2006, six officers from the FBI Violent Crimes Task Force,[2] including Investigator Michael Blegen, Detective John Cooley, and Officer Chad Obersteadt, went to a residence at 8014 Manning in Raytown, Missouri to execute an arrest warrant for Williams, who had allegedly violated the terms of his parole. The officers had received a tip that Williams was threatening to burn down houses of people who lived near him at a previous residence. They also knew that Williams had been arrested in 2004 for being a felon in possession of a firearm.

Officer Blegen and several other officers went to the front door of the house while some officers secured the rear of the house. Blegen knocked on the front door and announced, "Police!" A child peered out and unlocked the door, but did not open it. Blegen heard the child calling out for her mom and dad. While this was occurring, Detective Cooley observed Williams run to the rear door of the house as if to exit, turn, and go back inside. Williams then went into the living room, which was in the front of the house, where he was arrested. Williams's girlfriend, Virginia Brown, and the child were also present.

After Williams was handcuffed on the living room floor, several of the police officers conducted a search, looking for any other individuals in the home who may have posed a danger to them. Upon entering a bedroom, Officer Obersteadt saw a

---

[2] The Task Force is a unit composed of officers from several federal and state law enforcement agencies.

black semi-automatic pistol on top of a high bookcase, partially concealed in a pile of clothing.

Cooley, a detective with the Kansas City, Missouri Police Department, took custody of the firearm. When filling out the inventory sheet for the firearm, Cooley indicated that the firearm was not intended to be used as evidence and answered "yes" to the question, "May the property room release or dispose of the property according to the approved procedures?" Cooley stated that he filled out the form in this way because a decision had been made by state officials that Williams would not be arrested for possession of an illegal firearm. The firearm was test fired by the Kansas City, Missouri Police Crime Laboratory. The gun was capable of discharging a cartridge, but the cartridge case had to be manually removed after it was fired. The forensic specialist who tested the firearm noted that, in addition to missing the extractor that would have ejected the cartridge cases, the gun was also missing the safety lever and the left grip. The firearm was also tested for the presence of DNA; Williams's DNA was found in the sample from the weapon. On March 16, 2007, consistent with the directions on the inventory sheet, the firearm was destroyed.

Williams was indicted in federal court on May 9, 2007, on one count of being a felon in possession of a firearm. Williams filed several pre-trial motions, including motions to suppress the firearm as being the fruit of an unconstitutional search, and to dismiss the indictment based on the destruction of the firearm. The district court denied both of these motions, and Williams was found guilty following a jury trial.

II.

A.

Williams's first argument on appeal is that the district court erred in denying his motion to suppress the firearm because it was obtained in violation of the Fourth

-3-

Amendment. "We examine the factual findings underlying the district court's denial of the motion to suppress for clear error and review de novo the ultimate question of whether the Fourth Amendment has been violated." United States v. Walsh, 299 F.3d 729, 730 (8th Cir. 2002) (internal quotation marks omitted). The parties agree that there was no warrant for the search of Williams's home. Therefore, the firearm is admissible only if the search falls into an exception to the warrant requirement.

In Maryland v. Buie, the Supreme Court held that a properly limited warrantless protective sweep may be conducted "in conjunction with an in-home arrest when the searching officer possesses a reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene." Maryland v. Buie, 494 U.S. 325, 337 (1990). A protective sweep must be quick and limited to a cursory look at places where a person could be found. Id. at 335-36.

The government alleges that the search of the bedroom did not require the officers to demonstrate any suspicion because the search was incident to arrest and the bedroom was adjacent to the living room, where Williams was arrested. See id. at 334 (officers may, "without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched"). The district court made no findings of fact regarding the proximity of the two rooms or whether the scope of the search complied with this standard, nor did it rely on this basis for the admission of the challenged evidence. We need not address this contention on appeal, however, because we conclude that the officers had the reasonable suspicion required by Buie in order for a protective search to come within the limits of the Fourth Amendment.

In coming to the conclusion that the protective sweep was justified by reasonable suspicion that dangerous accomplices may have been present, the district court found the following "articulable facts and resulting rational inferences:"

-4-

> (1) [T]he child who came to the door when police first knocked called out to "Mom and Dad", indicating that more than one adult was in the house with the child, (2) the officers had prior information that defendant was threatening to burn down houses of his neighbors, (3) the officers knew that defendant had previously been arrested for possessing a firearm after having been convicted of a felony, and (4) officers observed defendant attempt to flee from police out the back door and therefore were aware that he wished to avoid capture.

From these facts, the district court concluded that the officers had shown that they acted on the reasonable suspicion that a hidden accomplice or accomplices could pose a threat to the officers.

Williams's attempt to evade arrest by turning back into the home after he saw the police at the back door, his resultant opportunity to alert a possible accomplice, and the police officer's knowledge of his prior conviction for unlawful possession of a firearm all support the officers' reasonable suspicion that an unknown individual in the home could pose a danger to them. See United States v. Jones, 193 F.3d 948, 950 (8th Cir. 1999) (retreat into building "could reasonably have been construed as an effort to get help or to warn others"); United States v. Davis, 471 F.3d 938, 945 (8th Cir. 2006) ("prior intelligence indicated that Davis possessed firearms, which could indicate a danger to officer safety").

Williams, however, argues that the search was pretextual because the police "ha[d] observed the only occupants of the home and they [were] aware that there [was] no one else in the home." While hindsight reveals that the officers had already encountered all of the occupants of the home before conducting the protective sweep, that information was not apparent to the officers when they initiated the sweep. Whether the search was a valid protective sweep depends on whether the facts possessed by the officers and the rational inferences from those facts created a reasonable suspicion that a dangerous individual may be hidden in the home. The district court found that the officers heard a child yell "Mom and Dad," creating the

inference that at least two, but possibly more than two, adults were present. The officers had no reason to know that Williams was the child's father, and thus it was rational for the officers to infer that one or more adults were still in the home, unseen by officers.[3]

Williams also contends that the search was unreasonable because police had arrested him and removed him from the scene before the protective sweep occurred. The district court, however, found that the arrest and protective sweep were simultaneous. The district court's finding is not clearly erroneous. Officer Blegen testified that the search occurred "as Mr. Williams was placed on the ground and was arrested," and Detective Cooley's testimony was that Williams was handcuffed in the living room when the sweep took place. Although Williams was handcuffed before the search occurred, a valid protective sweep may be conducted within a reasonable period of time after the subject of the warrant has been arrested. Davis, 471 F.3d at 944 (protective sweep "may be executed after an arrest if there is a reasonable possibility that other persons may be present on the premises who pose a danger to the officers"). For these reasons, we affirm the district court's denial of Williams's motion to suppress.

## B.

Williams also appeals the district court's denial of his motion to dismiss the indictment on the ground that the firearm seized in the search of his home was

---

[3] At the suppression hearing, the officers described the sweep as "standard procedure" and a "normal practice." We caution that a protective sweep may not be conducted as a matter of course. See Davis, 471 F.3d 938, 946 n.5 (8th Cir. 2006) ("Buie clearly instructs that protective sweeps must be justified on an individualized basis."). "Buie authorizes protective sweeps for unknown individuals in a house who may pose a threat to officers as they effectuate an arrest; Buie does not allow a protective sweep for weapons or contraband." United States v. Waldner, 425 F.3d 514, 517 (8th Cir. 2005).

destroyed before trial, in violation of the Fifth Amendment. We review his motion to dismiss the indictment de novo. See United States v. Novak, 217 F.3d 566, 570 (8th Cir. 2000). Suppression by the prosecution of evidence favorable to the defense is a violation of due process. See Brady v. Maryland, 373 U.S. 83, 87 (1963). "To establish a Brady violation, the defendant must show the government suppressed evidence that was both favorable to the defense and material to the issue of guilt or punishment." United States v. Farmer, 312 F.3d 933, 936 (8th Cir. 2002). Further, "[u]nless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." Arizona v. Youngblood, 488 U.S. 51, 58 (1988).

Williams argues that he was deprived of the opportunity to show the jury that the firearm did not work properly, and that such a demonstration may have been exculpatory. We have repeatedly rejected the contention that a firearm needs to be operable in order to support a conviction under 18 U.S.C. § 922. See, e.g., United States v. York, 830 F.2d 885, 891 (8th Cir. 1987) ("Section 921(a)(3) [defining 'firearm'] does not require a firearm to be operable."); United States v. Maddix, 96 F.3d 311, 316 (8th Cir. 1996) (fact that firearm "could not be loaded without using certain tools" not a bar to conviction for being a felon in possession of a firearm). Williams does not dispute that the firearm was "designed to . . . expel a projectile by the action of an explosive," which meets the statutory definition of firearm. Thus, whether the firearm was operational is not material. 18 U.S.C. § 921(a)(3); see York, 830 F.2d at 891.

Williams further argues that the condition of the firearm was material to his guilt or innocence because its inoperable condition supported the defense theory that Brown, his girlfriend, purchased and possessed the weapon for protection and did not care about its condition. However, at trial, Williams was able to cross-examine the government's firearms expert regarding the firearm's condition. Williams also called Brown as a witness and elicited testimony that she had purchased the gun for her own

protection. She also testified about its condition and that it did not have a clip or bullets.

Williams also suggests that he was prejudiced by his inability to test the firearm for fingerprints. Williams cross-examined Officer Blegen about the gun, and Blegen testified that he had not requested that it be tested for fingerprints. Under similar facts we concluded that there is no Brady violation. See Farmer, 312 F.3d at 936 ("Appellant successfully presented the fact that the gun had not been fingerprinted to the jury; yet, the jury found a link between [appellant] and the firearm. We cannot conclude . . . [that the evidence] was favorable to the defendant and material to the issue of his guilt.").

Because we conclude that Williams was not deprived of the opportunity to present potentially exculpatory material evidence to the jury, we need not reach the question of bad faith on the part of law enforcement. See Youngblood, 488 U.S. at 58; see also United States v. Aldaco, 201 F.3d 979 (7th Cir. 2000) (no bad faith imputed to federal government based on municipal police department's destruction of evidence). We affirm the district court's denial of Williams's motion to dismiss the indictment.

III.

For the foregoing reasons, we affirm the judgment of the district court.

_____