# United States Court of Appeals
### For the Eighth Circuit

_____

No. 18-1445
_____

United States of America

*Plaintiff - Appellee*

v.

Kelvin Williams

*Defendant - Appellant*
_____

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis
_____

Submitted: June 13, 2019
Filed: February 27, 2020
_____

Before GRUENDER, STRAS, and KOBES, Circuit Judges.
_____

KOBES, Circuit Judge.

The district court[1] convicted Kelvin Williams of one count of felon in possession of a firearm, two counts of possession with intent to distribute cocaine and

[1] The Honorable John A. Ross, United States District Judge for the Eastern District of Missouri, adopting the report and recommendations of the Honorable Noelle C. Collins, United States Magistrate Judge for the Eastern District of Missouri.

marijuana, one count of maintaining a premise for the purpose of distributing a controlled substance, and one count of possessing a firearm in furtherance of a drug trafficking crime. 18 U.S.C. §§ 841(a)(1), (b)(1)(C), (b)(1)(D) & 924(c)(1)(A); 21 U.S.C. § 856. On appeal, Williams alleges that the district court erred by: (1) admitting evidence seized after a warrantless protective sweep, (2) failing to permit Williams to represent himself at trial, (3) accepting his waiver of his right to a jury trial, and (4) failing to grant a motion to dismiss his indictment for a *Brady* violation. Finding no error, we affirm.

## I.

On June 16, 2015, St. Louis Metropolitan Police officers responded to a 911 emergency call reporting a burglary at 4118 Shreve Avenue. While a home security siren sounded, law enforcement approached the front door with guns drawn. The officers observed broken windows on the main and storm doors. There was blood on the porch floor and on a window shade stuck through the broken glass. The door had footprints on it and was ajar. Rather than forcing the door further, an officer reached through the broken window, unlocked the deadbolt, and opened the door.

Police entered the home and began a protective sweep to look for intruders or victims. The bedroom on the main floor had been ransacked: the bed was overturned, a dresser blocked a door, and items (including a firearm) were strewn all over the floor. As they attempted to reach the blocked door, officers stepped on loose papers, suspected drugs, and drug paraphernalia. Officers saw more drugs, scales, test tubes, pills, rubber bands, baggies, and another firearm when they moved the dresser to unblock the door. In the basement, an officer seized a bag with white powder visibly hanging out of a hole in the wall.

During the protective sweep, the officers also saw a Night Owl DVR System (Security DVR) near the television in the living room. There were wires running from the Security DVR to video cameras installed on the interior and exterior of the home, including one aimed at the front door. Finding no one in the house, the

officers contacted detectives to join them at the scene. Officers collected and seized the drugs, firearms, and paraphernalia they found plus a cell phone and documents showing Williams's name and address. The detectives also unplugged and seized the Security DVR.

Three days later, investigators obtained a warrant to search the contents of the cell phone, the Security DVR, and a safety deposit box listed on the documents seized from the house. The Security DVR was kept in a sealed bag in an officer's locker until it was given to the Cyber Crimes Unit. A search of the Security DVR revealed more than 41,000 video clips recorded over three months, including some of Williams carrying a firearm and buying, bagging, cutting, weighing, and selling narcotics inside the house.

Although the Security DVR showed the suspected burglars stepping up to the front door, it did not show them inside the house. Also, footage shows that police went beyond the scope of a protective sweep by opening kitchen cabinets and a microwave. They also turned on the television and waved at the security camera in the living room.

## II.

Williams argues that the district court erred in denying his motion to suppress the evidence seized from his home because once police "completed their search and found no burglars or victims," the "Fourth Amendment required them to leave." Williams's Br. 36. He agrees that exigent "circumstances justified the police intrusion into his home to conduct a sweep for criminals or crime victims" and "police were entitled to take evidence found in plain view with them." *Id.*

When a district court denies a motion to suppress, we review factual findings for clear error and questions of law *de novo*. *United States v. Hollins*, 685 F.3d 703, 705 (8th Cir. 2012). "We will affirm the denial of a suppression motion unless we

find that the decision is unsupported by the evidence, based on an erroneous view of the law, or the Court is left with a firm conviction that a mistake has been made." *United States v. Riley*, 684 F.3d 758, 762 (8th Cir. 2012) (citation omitted).

"Where the initial intrusion that brings the police within plain view of [] an article is supported, not by a warrant, but by one of the recognized exceptions to the warrant requirement, the seizure is also legitimate." *Coolidge v. New Hampshire*, 403 U.S. 443, 465 (1971); *United States v. Chipps*, 410 F.3d 438, 442 (8th Cir. 2005) (same). This is true even if "a police officer is not searching for evidence against the accused, but nonetheless inadvertently comes across an incriminating object." *Coolidge*, 403 US at 466. "During a properly limited protective sweep, the police may seize an item that is in plain view if its incriminating character is 'immediately apparent.'" *United States v. Green*, 560 F.3d 853, 856 (8th Cir. 2009). In this context, immediately apparent means that "the police have probable cause to believe an item is incriminating." *Id.* at 858.

Here, police observed incriminating items[2] during a lawful protective sweep of Williams's home. Officers had to step over drugs, drug paraphernalia, and two firearms lying on the floor. In the basement, an officer saw a bag with a white substance sitting in a cutout portion of the wall. The officers then "called for detectives realizing how much – how many different types of narcotics were located there." Williams's Br. 24–25.

Williams cites *Mincey v. Arizona*, 437 U.S. 385 (1978) for the proposition that when exigent circumstances have dissipated the Fourth Amendment requires law enforcement to leave evidence they discovered during the sweep. Nothing in that

---

[2] At oral argument, Williams agreed that he had not challenged the seizure of the Security DVR on the grounds that it was not incriminating in the district court or fairly raised the issue here. The argument has been waived. *United States v. Wearing*, 837 F.3d 905, 910 n.6 (8th Cir. 2016) (per curiam).

case requires officers to either immediately collect evidence while they are sweeping a house or leave evidence in the home following a protective sweep. The search in *Mincey* was unconstitutional because law enforcement *began* a "four-day search that included opening dresser drawers and ripping up carpets" *after* the exigency had ended. *Id.* at 393. The Court recognized that "police may seize any evidence that is in plain view during the course of their legitimate emergency activities." *Id.* That is what happened here. Officers stayed for about an hour to collect a large amount of evidence they saw *during* the protective sweep.[3]

We agree with the district court that the evidence was properly seized under the plain view doctrine and affirm the denial of the motion to suppress.

### III.

Next, Williams contends that "the Government intentionally destroyed or altered exculpatory evidence" from the Security DVR, Williams's Supp. Br. 19, and that the district court erred by "failing to grant [his amended] motion to dismiss [the indictment] and in failing to enter judgment of acquittal," *id.* at 22. We agree with the district court that Williams has not shown that the Government deleted any evidence, let alone exculpatory evidence.

We review the district court's denial of a motion to dismiss an indictment *de novo*. *United States v. Williams*, 577 F.3d 878, 882 (8th Cir. 2009). The Government has an obligation "to disclose to the accused favorable evidence that is material to guilt or punishment." *United States v. Dones-Vargas*, 936 F.3d 720, 722 (8th Cir. 2019). Evidence is material "when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Smith v. Cain*, 565 U.S. 73, 75 (2012). To succeed on a claim that the Government

---

[3] Although the officers exceeded the scope of a protective sweep by looking in the microwave and kitchen cabinets, they seized no evidence from there.

failed to preserve "potentially useful evidence," a criminal defendant must show the police acted in bad faith. *Williams*, 577 F.3d at 882 (quoting *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988)).

Williams argues that the Government "manipulated and changed the hard drive prior to delivering it to the forensic lab" and "acted in bad faith in manipulating and altering the [Security] DVR." Williams's Supp. Br. 22. Williams points to an undisputed change between the hash value of the Security DVR's image taken on June 23, 2015 and an image taken on February 27, 2017, as evidence that the Government tampered with Security DVR before and after the forensic lab received it. The evidence does not support either theory.

A hash value is a string of characters generated by a specific algorithm that represents a given set of data stored in an electronic drive or file. Richard P. Salgado, *Fourth Amendment Search and the Power of the Hash*, 119 Harv. L. Rev. F. 38, 38–40 (2005). We have referred to them as "digital fingerprints" because the hash value is "calculated in a way that makes it highly unlikely another set of data will produce the same value." *United States v. Ackerman*, 831 F.3d 1292, 1294 (10th Cir. 2016); *United States v. Finley*, 612 F.3d 998, 1000 n.3 (8th Cir. 2010). We accept, as the parties did, that if the hash values between two images of the same file or drive match, the copies are identical. The district court heard testimony explaining that removing a single character from a single file would "drastically" change the hash value for the Security DVR. March 1 Pretrial Conf. at 80:24–81:7. Thus, a change between the two images' hash values shows that an unknown amount of data on the Security DVR changed between June 23, 2015 and February 27, 2017.

The hash value changing between the June 23 and February 27 images only shows that the Security DVR was powered on and off and does not, by itself, indicate that video or image files were added, changed, or deleted. Officer Baine, a forensics examiner in the Cyber Crimes Unit, testified that after creating a pristine image on June 23 he set the Security DVR so it would not record over existing video on the

drive. On February 23, 2017, Officer Baine generated a hash value for the entire contents of the June 23 image and separate hash values for each of the 41,000 video files on the Security DVR. He also restored the June 23 image to the Security DVR for the defense expert,[4] which required him to power on the Security DVR twice. The Security DVR, as programmed, created an entry in a video loss log when it was turned on and did not receive a feed from the video cameras. Williams's expert confirmed that the Security DVR had recorded video loss logs on June 16, 2015 and two entries on February 22, 2017.[5] He agreed that this meant "someone turned the DVR on." March 1 Pretrial Conf. Tr. at 19:18–21. As a result, it would be impossible for the February 27 hash value to match the June 23 hash value because the Security DVR created new files on February 23 when it was turned on and off. So the hash value change, alone, does not prove destruction or alteration of evidence.

Williams's claim that the evidence shows police tampered with the Security DVR before turning it over to the forensic lab also fails. As a preliminary matter, the hash values cannot show misconduct before the Security DVR reached Officer Baine—because he created the hash values. Instead, Williams points to video footage the Government produced showing police opening cabinets, using the television, and waving at a camera on the day of the burglary to show that they tried to alter the Security DVR. Although the video footage shows some misbehavior, it does not show that police tampered with the Security DVR. Plus, the manual for the Security DVR explains that "You cannot delete an individual file directly from the device."

---

[4] The district court never found that Williams's expert was qualified, so like the district court, our use of "expert" is for ease of reference.

[5] Both parties agree that the Security DVR's internal clock was incorrect by at least 71 days. The Government concluded that the clock was off by an additional 11 hours and 13 minutes, but Williams's expert did not compensate for that time in evaluating the date of the video loss logs. This likely accounts for the discrepancy between the date Williams's expert (February 22) and the date the Government (February 23) note that the Security DVR created new events in the video loss logs.

D. Ct. Dkt. 128-2 at 33.  And at trial, an officer testified that they could only see a basketball game on the television and that no one attempted to access the Security DVR at the house.  Officer Baine explained that he received the Security DVR on June 19 in a sealed evidence bag, and his examination of the Security DVR confirmed that the device had been turned off since it was seized.

Williams also argues that the absence of footage showing the burglars in the home (on the same day police are seen) suggests that the Government tampered with the Security DVR.  Although there was no video camera in the bedroom the burglars ransacked, the video cameras should have recorded the burglars' journey from the front door to the bedroom.  We acknowledge, as does the Government, that this is odd.  The prosecutor alerted defense counsel to this anomaly during discovery.  And at that time, he invited defense counsel "to inspect and copy all, or any portion, of the contents of the [Security] DVR."[6]  D. Ct. Dkt. 42.  Ultimately, this unexplained "absence" of video shows only that it does not exist or could not be recovered, but it does not show bad faith by the police.  We further note that it makes little sense that the Government would have destroyed evidence of the burglars' crime yet turned over video of police misbehavior after the protective sweep ended.

Finally, Williams cannot show that any missing data would be exculpatory because the unchallenged video on the Security DVR overwhelmingly proved his guilt.  The Government introduced more than 20 video clips showing him receiving, bagging, cutting, weighing, selling, and distributing narcotics, numerous clips with him possessing a firearm on different occasions, and footage of Williams using a firearm in connection with drug transactions.  Williams did not, and does not here, challenge the accuracy or authenticity of those videos.  His computer expert conceded that there was no evidence that the individual video files had changed and had "no

---

[6] Defense counsel's representations that the Government delayed access to either the video or the Security DVR are untrue.  Williams's Supp. Br. 14, 18, 19; Reply Br. 3, 13.

dispute with all of the existing videos on the DVR." March 1 Pretrial Conf. Tr. 26:11–14. Before the district court, Officer Baine confirmed that the June 23 image and the February 27 image contained the same number of video clips. He also testified that the hash values for each of those clips were the same on both images. His examination showed that there is a motion log that corresponds to each video clip and that those logs are the same on both images. He explained that "[i]f a video had been deleted, I would see a motion entry log, but then no video," but that did not happen. *Id.* at 73:2–5. Williams does not advance a theory of what other data his Security DVR contained or even that it was useful data, like videos, that would exonerate him from acts shown on the unchallenged, pristine video.

We agree with the district court that the evidence, at most, shows that someone turned on the Security DVR after it had been imaged on June 23, 2015. Although there may be some footage from the Security DVR that neither party recovered, Williams has not shown that police manipulated any video or other file, nor that any such evidence would change the outcome of the trial.

IV.

Williams also argues that he did not knowingly waive his right to a jury trial because the district court failed to tell him that the Government must prove his guilt beyond a reasonable doubt. We review the district court's finding that Williams voluntarily waived his rights *de novo*. *United States v. Guide*, 891 F.3d 744, 748 (8th Cir. 2018). The Government suggests that plain error review applies because Williams failed to object to the waiver before the district court. *See United States v. Williams*, 559 F.3d 607, 613 (7th Cir. 2009). We find that the district court committed no error (plain or otherwise) and affirm.

The Sixth Amendment guarantees criminal defendants a jury trial, but a "defendant has a right to waive his constitutional right to a jury trial provided such waiver is voluntarily, knowingly and intelligently made." *Dranow v. United States*,

325 F.2d 481, 482 (8th Cir. 1963). Whether a defendant has validly waived that right depends on the unique circumstances of each case, and a district court considers a variety of factors "including but not limited to the extent of the particular defendant's ability to understand courtroom discussions regarding the waiver." *Guide*, 891 F.3d at 748.

Williams alleges he could not "knowingly" waive his jury trial right without knowing what standard the fact finder would use to determine his guilt. He cites no authority for this, and it is the Due Process Clause, not the Sixth Amendment, that requires the reasonable doubt standard in criminal cases. *In re Winship*, 397 U.S. 358, 364 (1970). Other courts have held that "[a] defendant is sufficiently informed to make an intelligent waiver if he was aware that a jury is composed of 12 members of the community, he may participate in the selection of the jurors, the verdict of the jury must be unanimous, and that a judge alone will decide guilt or innocence should he waive his jury trial right." *United States v. Martin*, 704 F.2d 267, 273 (6th Cir. 1983); *see also United States v. Robertson*, 45 F.3d 1423, 1432 (10th Cir. 1995); *United States v. Rodriguez*, 888 F.2d 519, 527 (7th Cir.1989); *United States v. Cochran*, 770 F.2d 850, 853 (9th Cir. 1985). We agree.

The district court's colloquy clearly shows that Williams knew the consequences of the waiver. Williams understood he had "an absolute right to a trial by a jury made up of 12 people, all of whom would have to agree as to [his] guilt before [he] could be found guilty." March 6 Tr. 5:22–6:2. He knew that he could participate in the selection of jurors. Williams agreed that the judge alone would be the trier of facts and determine his guilt or innocence. After a short recess for Williams to discuss the waiver with counsel, the court reiterated the nature of the right and Williams executed a Rule 23 compliant waiver. We are left with no doubt that Williams validly waived his right to proceed with a jury trial.

V.

Finally, Williams claims that it was error for the district court to deny his motion to proceed *pro se* on the morning that his jury trial was set to begin. We review the denial of his motion *de novo*. *See United States v. Mosley*, 607 F.3d 555, 558 (8th Cir. 2010).

The Sixth Amendment "necessarily implies the right of self-representation." *Faretta v. California*, 422 U.S. 806, 832 (1975). But that right is not absolute. *United States v. Edelmann*, 458 F.3d 791, 808 (8th Cir. 2006). Among other requirements, the request must be timely and cannot be used as a tactic for the delay, disruption, distortion, or manipulation of the trial process. *Id.* at 808–09.

The district court found it "apparent that Defendant seeks to utilize his right of self-representation as a tactic for delay and disruption, as well as to manipulate the trial process itself." D. Ct. Dkt. 159 at 2. It noted that Williams had a "long history of dismissing his attorneys" and that in nineteen months he was on his fifth attorney. *Id.* The district court reviewed Williams's motion and explained that it raises "issues [that] have been raised and ruled on by the Court." March 6 Tr. 12:21–13:3.

The docket shows that Williams received six extensions to file pretrial motions, and after filing his first motion, Williams retained new counsel who received yet another extension to file a new motion. Two of the four continuances the district court granted Williams occurred because he had dismissed his attorneys weeks prior to the trial date. When it granted the final continuance, the court noted "it is very frustrating that we are here on the Friday before the Monday of trial to be in this position," February 24 Pretrial Conf. Tr. 37:20–21, and that "this case has been pending for many, many, many months" and "[i]t has been set for trial on a number of occasions," *id.* at 38:5–9. We agree with the district court that Williams's conduct showed a pattern of replacing attorneys to delay the proceedings and that he would be disrupting the trial to relitigate issues already decided.

-11-

Williams argues that statements he made at the final pretrial conference (five days before trial) show problems with his attorney and that he did not seek to delay trial.[7] It is unsurprising that a defendant who had just lost a motion to dismiss an indictment would be unhappy with counsel, but we disagree that these statements show Williams was ready to conduct his own defense. The court gave notice that the trial was starting on Monday—implying that trial would proceed even if Williams replaced counsel for the fifth time. Williams's confirmation that he was ready to go to trial merely showed acceptance that trial would begin Monday. March 1 Pretrial Conf. Tr. 92:14–15 ("Let it be what it be.").

We recognize that a motion to proceed *pro se* filed on the day of trial can be timely, *United States v. Patterson*, 140 F.3d 767, 775 (8th Cir. 1998), but we agree with the district court's finding that Williams's motion was untimely on the morning of trial under the facts presented here. *Edelmann*, 458 F.3d at 808 (request made four to five days before trial untimely); *see also United States v. Kelley*, 787 F.3d 915, 918 (8th Cir. 2015) (day of trial request untimely).

VI.

Accordingly, we affirm the district court in full.

———————————————

———————————————

[7] Williams appears to suggest that the district court "forced" counsel on him by repeating that he should "just talk to Mr. Sims, work with him." We see the district court's statements as an attempt to protect attorney-client communications from being repeated in open court before the prosecutor.